[No. S070839. Aug. 25, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL JOE CARASI, Defendant and Appellant.

1264

**1270** 

COUNSEL

Eric S. Multhaup, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BAXTER, J.**—Paul Joe Carasi (defendant) and his live-in girlfriend, Donna Lee (codefendant or Lee), were charged, tried, and convicted in the same proceeding of committing two first degree murders on Mother's Day 1995. (Pen. Code, § 187.)[1] The victims were defendant's mother, Doris Carasi (Doris), and his former girlfriend, Sonia Salinas (Sonia), the mother of his child. As to each murder count, the jury returned a lying-in-wait special-circumstance finding (§ 190.2, subd. (a)(15)), and a finding of personal use of a deadly weapon, i.e., a knife. (§ 12022.) With respect to Sonia's murder, the jury also found true the special circumstances of multiple murder (§ 190.2, subd. (a)(3)), and murder for financial gain. (§ 190.2, subd. (a)(1).) After a joint penalty trial, the jury returned a death verdict against defendant, but not against codefendant Lee.[2] The trial court denied defendant's automatic motion to modify the penalty verdict. (§ 190.4, subd. (e).) The present appeal from the death judgment is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)

We find no prejudicial error at defendant's trial. The judgment will be affirmed in its entirety.

### I. GUILT EVIDENCE

#### A. *Summary*

Prosecution evidence showed that defendant and Lee planned to kill Sonia and Doris, to make the crime look like a robbery, and to place the blame on unknown third parties. The knife slayings occurred in a remote section of the

---

[1] All unlabeled statutory references are to the Penal Code.

[2] The penalty jury could not reach a unanimous verdict as to codefendant Lee. The vote was split 10 to two in favor of death. The prosecution declined to retry Lee, and she received a sentence of life without the possibility of parole for each murder count. She is not a party to this automatic appeal.

parking garage at the Universal Studios CityWalk Mall in Burbank (Universal or Mall), after defendant took the victims, along with his and Sonia's two-year-old son, to a late-night Mother's Day meal. The child was unharmed, but defendant was found covered in the women's blood in the garage, claiming to be a victim of the same "robbery" as the two women. Lee, who had waited in the garage for the group to return from dinner, participated in the knife attack and then drove off with defendant's and the victims' personal property. Lee's getaway was frustrated, however, and the plot began to unravel, when she was forced to summon emergency medical aid from the highway for serious wounds sustained in the attack. According to the prosecution, defendant murdered the victims because he believed they were trying to keep him from his son, and because he could not afford to pay court-ordered child support to Sonia in his debt-ridden state.

B. *Prosecution Case*

1. *The Crime Scene*

Shortly after 11:00 p.m. on May 14, 1995, Mother's Day, both the security office at Universal and a nearby sheriff's station received reports of criminal activity in the parking garage—an area which, unlike the Mall, had no security cameras. Persons who arrived on the scene included Deputy Sheriff Tom Wilford, security officer Joseph Hildebrand, and Darren Smith, an employee in the Mall.

At trial, Smith and Deputy Wilford gave similar accounts. On the fourth floor of the garage, defendant was lying on the ground near the stairwell. He pointed to the fifth floor, and told Smith, "My kid is up there." Defendant said something different to Wilford, who arrived moments later—"They killed them."

Defendant was drenched in fresh blood. Wilford testified that it covered defendant "from his head to his toes," including his face and hands. Smith recalled that defendant slipped in the blood as he moved and tried to stand.

Smith testified that after finding defendant, he climbed the stairs to the fifth floor. Smith saw bloodstains in the stairwell. He also found a large folding knife on the steps, with the blade closed and no blood on it. A short time later, in front of Officer Hildebrand, defendant spontaneously said the knife was his.

The fifth floor served as the roof of the garage, and was not itself fully covered. There, Smith, Deputy Wilford, and Officer Hildebrand saw a blue, four-door Chevrolet Caprice, later identified as defendant's car. It was parked

in the corner against the wall, out in the open air. A few other vehicles were parked on the same floor, but none was near the Caprice.

Both doors on the driver's side of the car were open. A small boy was strapped in a car seat behind the driver's compartment. He was crying, but seemed physically unharmed. In the presence of Smith, Deputy Wilford, and Officer Hildebrand, the child screamed "Mommy" repeatedly, and pointed towards the passenger side of the car.

There, in a small space enclosed on three sides by the car and garage walls and railing, the witnesses found two women lying in large pools of blood. They bore stab wounds and appeared to be dead. The bloody trail that Smith had seen downstairs and in the stairwell continued onto the fifth floor, near the bodies.

Deputy Wilford summoned more law enforcement support. Meanwhile, defendant arrived on the fifth floor. He paced and shook his hands at one point, and sat on the ground rocking back and forth at another point. At Wilford's request, Officer Hildebrand watched and comforted defendant. Defendant identified the two women and the boy. Defendant indicated that he was not hurt, and did not know why he was so bloody. He denied touching the injured victims.

Defendant described the following events to Officer Hildebrand: He unlocked the car for his family after they returned from dinner. Just as he realized he did not have all of his keys, defendant was shoved from behind by someone who demanded money. Though defendant said he had no money, the assailant removed defendant's fanny pack from his shoulder and pushed him to the ground. Defendant stood up and saw Sonia and Doris lying in pools of blood. He headed downstairs to get help. Defendant heard male voices and the victims' screams during the attack, but could not describe the number or appearance of his assailants, or the manner in which they left the scene.

Paramedics arrived on the fifth floor of the garage a short time later. One of them, Alan Lenhart, testified that, after determining that the women were dead and the child was unharmed, he and his partner examined defendant, removing his jacket and shirt—a shirt with Disney characters on the front.[3] The only visible injury was a small cut on his thumb. The cut was not bleeding and, in Lenhart's view, could not account for all the blood on

---

[3] Criminalist Beverly Kerr, who arrived at Universal after the paramedics examined defendant, testified that she recovered a pile of clothing and towels from the fifth floor of the garage, including the long-sleeved Disney shirt that defendant had apparently worn. The Disney shirt was saturated with blood on the front and cuffs, and bore a bloody handprint. As discussed below, scientific testing linked most of these stains to Sonia.

defendant. In response to questions, defendant sometimes moaned or cried out. Other times, however, he seemed calm and gave clear answers. Lenhart testified that this pattern was unusual. In his experience, traumatized persons act either withdrawn or upset, but not both. When the paramedics spoke about canceling an ambulance, defendant seemed surprised and asked whether his mother was alive.

In his exchange with Lenhart, defendant repeated much of what he had said to Officer Hildebrand, but added or changed certain details. In the later version, defendant said for the first time that he leaned inside the car to kiss Sonia, turned to go downstairs to retrieve the ignition key from the restaurant, and was grabbed by the hair from behind and sat upon after being pushed down. Contrary to his prior account, defendant also told Lenhart that the person who attacked him was not the same person who demanded money.

### 2. Events Preceding the Crime

In 1991, defendant and Sonia began dating. They both worked for the Bank of America (Bank) in its check processing center in downtown Los Angeles. When Sonia became pregnant, she moved into the North Hollywood apartment defendant shared with his mother, Doris. The couple continued living there after their son, Michael, was born in January 1993.

In mid-1993, when Michael was about six months old, Sonia became quite ill. She was hospitalized for long periods during which Doris cared for Michael. After Sonia left the hospital, her relationship with defendant soured. She moved with Michael to her family's home in West Hollywood, and brought him to visit Doris at her apartment on weekends.

Defendant disliked Sonia's new living arrangements, and feared her family might prevent him from seeing his son. According to Sonia's manager, Martha Dominguez, defendant said he was willing to kill to prevent such interference. Defendant told a coworker, Robert Mora, that he wished "that bitch," Sonia, had "died" in the hospital. Sonia resumed working at the Bank in mid-1994.

The evidence suggested defendant was controlling and volatile at times, especially toward women. Dominguez and Mora each described one instance in which they saw or heard about defendant either violently grabbing or verbally abusing his mother. Mora testified that defendant sexually propositioned many women at work. One of them, Wendy Osiow, testified that she complained to superiors about defendant. In testimony echoed by other coworkers, Nicholas Latimer described defendant as a "wanna-be cop" who carried a police scanner and whose car looked like an unmarked police

vehicle. According to Latimer, defendant liked to drive his car to Hollywood and scare street prostitutes into thinking they were being watched by the vice squad.

Sometime in fall 1994, defendant began dating codefendant Lee, a married coworker who knew many of the same people as defendant and Sonia. Lee moved into the apartment defendant shared with his mother, Doris, and decided to divorce her husband.

Meanwhile, Sonia obtained a court order directing defendant to pay her $375 in monthly child support and requiring the money to be deducted from his wages. To facilitate this process, defendant and Sonia both signed a letter, dated December 1, 1994, asking the Bank to deduct one-half of the amount defendant owed Sonia from each of his two monthly paychecks, and to place the money in her checking account. This arrangement, which the couple's letter referred to as "garnishment," took effect immediately.

Over the next few months, defendant experienced mounting financial strain. He earned a gross salary of $1,886 a month, or $22,632 a year. After deductions, including child support, his net pay totaled $960 a month. On May 8, 1995, six days before the crime, he had $271 in his checking account and $265 in his savings account.

At the same time, defendant owed over $21,000 in consumer debt. In addition, defendant and Lee jointly obtained a Household Finance loan in late 1994. The original balance of $10,000 remained unpaid in May 1995.

Defendant resented Sonia as a result of the wage garnishment. One of his supervisors, Lydia Moreno, testified that defendant said he could not pay his bills because of child support payments, that creditors called him at work, and that he was "fucked for the next seven years, because he was going to have to file bankruptcy." Osiow overheard defendant say he wished Sonia "were dead" to avoid giving her "half [his] stuff." Defendant told Latimer many times that Sonia was a "bitch" and a "whore" because of the money deducted from his paycheck.

At some point before February 1995, while confiding in Dana Shafer, one of his managers, defendant asked if the Bank made "legal referrals" to help answer child custody and support questions. In late March or early April 1995, defendant discussed whether to declare bankruptcy with an attorney, Rene Lopez de Arenosa. Codefendant Lee was present during this meeting.

Defendant and Lee were both upset with Sonia about parenting issues. Coworker Deborah Trudeau testified that Lee became agitated when she once

saw Sonia with defendant's son, Michael, at work. Both Lee and defendant complained to Trudeau, Osiow, and others that Sonia was impeding visitation with Michael. According to his friend Mora, defendant said, "Fuck that bitch. She won't get away with taking my kid. I'll get her one day." Defendant told his manager, Shafer, that Sonia "wasn't going to be around" to challenge custody.

In April 1995, relations further deteriorated between defendant and Lee on the one hand and Sonia and Doris, on the other hand. The events were relayed at trial by supervisors and coworkers (e.g., Dominguez, Moreno, and Trudeau) who learned about them from Sonia, Lee, or defendant.

Following an argument, Doris ordered defendant and Lee out of her apartment. They moved to a unit across the hall in the same building. The incident triggered heart problems in Doris, who was briefly hospitalized. Afterwards, over the Easter weekend, Sonia stayed in Doris's apartment and cared for her. Defendant approached Sonia on Easter Sunday, April 16, 1995, and asked her to take a drive with him. He then disclosed his sexual relationship with Lee. Sonia became upset and "backhanded" defendant. When they returned to the apartment complex, defendant acted like he was having a seizure and was helped to his apartment by two bystanders. When Doris tried to see defendant, Lee would not let her inside the door, and the two women physically fought one another. Defendant subsequently talked about getting a restraining order against Doris.

On May 5, 1995, Sonia and Michael moved into Doris's apartment, planning to stay one week. According to Sonia's family, she and Doris were considering leaving North Hollywood and relocating together, with Michael, in either Whittier or San Francisco.

The next day, May 6, 1995, which was about a week before the murders, defendant and Lee were seen walking with one another at Universal by two Bank managers, Adrienne Gavura and Shafer, who went there together with friends. Gavura testified that defendant and Lee seemed shocked by the encounter. Shafer testified that defendant and Lee looked guilty. The same week, another coworker overheard Lee say she was "going to do something stupid" for which she would go "to prison." Both defendant and Lee had scheduled one week's vacation from work beginning Monday, May 15, 1995.

On Sunday May 14, 1995, defendant took Sonia, Doris, and Michael to the Country Star restaurant at Universal. When they entered the garage at 8:51 p.m., ample parking was available in areas much closer to the restaurant than the rooftop on which the car was later found. Their waitress commented to a coworker that defendant was acting strange. At trial, she recalled that he

ordered the "strongest" drink on the menu (a seven-liquor ice cream treat) before dinner. Also, he was patient with his fidgety son and brusque toward the women. They left the restaurant around 10:45 p.m.

Meanwhile, codefendant Lee drove to Universal that night, entering the garage at 9:57 p.m. A few minutes earlier, at 9:49 p.m., a brief call was made from a pay phone located inside the Country Star restaurant to defendant's cell phone, and was charged to his home phone number. The same cell phone was found in Lee's car later that night, as discussed below. The hostess at Tony Roma's restaurant, which is located between the Country Star restaurant and the parking garage, testified that she twice saw Lee walking fast toward the garage that night with a grave expression on her face.

### 3. *Discovery of Lee and Evidence Along Highway 170*

At 11:20 p.m. on May 14, 1995, shortly after the crime, two California Highway Patrol officers arrived at callbox 166 along Highway 170, five miles from Universal. They were responding to an emergency call from codefendant Lee, who reported being robbed and stabbed at that spot. The officers found Lee lying on the ground near her car, on top of a jacket, with her hands to her side. The car was locked with the keys inside. Lee moaned in pain, and muttered something about there being "nothing [she] could do" and not knowing "what happened." She had suffered an abdominal laceration from which she was bleeding and from which her intestines protruded. The officers dressed the wound and called paramedics.

After Lee was taken to the hospital, and additional investigators arrived on the scene, a search was made of the ivy-covered embankment that sloped down from the road. The search produced two fanny packs, one belonging to defendant and the other to Doris, and Sonia's purse. These items were covered in blood. Other bloodstained items found nearby included a knife with a blunted tip, a blue sweater, a latex glove, a washcloth, and a pair of wool gloves. Inside Lee's car, investigators found defendant's cell phone in the center console, and Lee's fanny pack and two plastic Ziploc baggies under the driver's seat—all bloodstained.

### 4. *Postcrime Investigation*

On May 15, 1995, the day after the murders, defendant visited Sonia's family. He was overheard telling someone on the telephone that he was "going to jail for a lot of years for this."

On May 15 and 16, Lee spoke with homicide detectives while awake and coherent in the hospital. She first denied knowing about her injuries or the

items found along Highway 170, and later screamed profanely at the officers to leave her alone. The clothing she wore when admitted to the hospital was bloodstained and had cuts in it. It was obtained by investigators and subjected to scientific testing, as discussed below.

Around the same time, officers saw defendant visiting Lee in the hospital, where they photographed cuts on his hands. They also obtained the jeans and jacket he wore the day of the murders. Both items were bloodstained. The jacket had cuts in it. The clothing underwent scientific testing, as discussed below.

Detectives arrested defendant on May 18, 1995. While being transported to jail and passing the courthouse, defendant turned to one of the detectives and asked what he "would get," or words to that effect, if he pled guilty. During the booking process, defendant said he wanted to talk to codefendant Lee. Detectives arranged the call and heard him say, "Remember what we talked about."

### 5. *Autopsy Results and Forensic Evidence*

Defendant's mother, Doris, sustained multiple penetrating stab wounds to the chest and back. Her most serious injury was a gaping knife wound to the throat that had been inflicted in a sawing motion, and that nearly decapitated her. It would have quickly caused death, and was likely inflicted last. Doris had no defensive knife wounds on her hands.

Serological testing, including DNA analysis, established that Doris's blood was consistent with blood found on the rear seat of defendant's car, on the Disney shirt he apparently wore the day of the crime, on the jeans defendant and codefendant Lee wore the same day, and on one of the wool gloves found near Lee along Highway 170.

Sonia Salinas was stabbed through the chest to the breast bone. She also suffered numerous deep incisions to her face and throat that intersected in the neck. Her carotid arteries and jugular vein were cut. These injuries would have quickly caused death and probably occurred last. Sonia had several deep defensive knife wounds on her hands.

Serological and DNA analysis established that Sonia's blood was consistent with blood found on the front seat of defendant's car, on the Disney shirt (including the bloody handprint), on defendant's jeans and jacket, and on the bloody trail running between the areas at the crime scene where defendant and the victims were found. Sonia's blood also was consistent with blood

found on items tossed along Highway 170, including the knife, defendant's fanny pack, the latex glove, and the plastic baggies found under the front seat of Lee's car.

Codefendant Lee suffered an evisceration in which the knife had been thrust deeply into the abdomen and moved around. She sustained another stab wound to the back, and a large cut on the inside of the left leg, above the ankle.

Serological tests, including DNA analysis, established that Lee's blood was consistent with blood found on Sonia's left shoe at the crime scene, and on items found along Highway 170. Such items included the fanny packs belonging to defendant and Doris, Sonia's purse, the blue sweater, one of the wool gloves, and the plastic baggies found inside Lee's car.

Defendant Carasi suffered cuts on both hands. Serological testing, including DNA analysis, established that his blood was consistent with blood found on the Disney shirt, on his jeans and jacket, and on the bloody trail at the crime scene. Defendant's blood also was consistent with blood found on his fanny pack and the blunt-tipped knife recovered along Highway 170, and on the plastic baggies found in Lee's car.

Dr. Eugene Carpenter, the pathologist who performed the autopsies, opined that each victim was restrained against a hard object. He testified that most knife fatalities involve injuries near the heart, not the throat, and that the large number of wounds sustained by Sonia and Doris was rare. On direct and cross-examination, the witness associated such injuries with domestic disputes and other crimes of passion. Dr. Carpenter further testified that defendant suffered at least one palm injury consistent with a "knifer's wound," which occurs when the knife strikes bone, and the hand slides down the handle onto the blade. Cuts on Sonia's hands were consistent with her having repeatedly deflected and grabbed the blade.

Steven Dowell, a criminalist specializing in tool mark analysis for the coroner's office, compared the knife found along Highway 170 to the victims' injuries. Several of Doris's wounds were consistent with the depth and width of the knife's blade. The blunted tip could have left certain irregular abrasions on Sonia's skin. No wound was inconsistent with the suspected murder weapon.

Elisabeth Devine, a crime reconstruction specialist with the sheriff's department, opined that Sonia and Doris were probably first attacked inside the car on the passenger side, and that each victim ended up outside the car, where they received their lethal neck wounds. Devine believed more than one

assailant was involved. It was likely that Sonia left the bloody handprint on the Disney shirt while grasping at her attacker, and that Sonia's shoe was in motion when it came in direct contact with blood from codefendant Lee's wounds.

## C. *Defense Case*

Defendant did not testify at trial. He called two witnesses, both of whom also testified for the prosecution, to suggest that he did not kill the victims, and that law enforcement bungled the investigation. First, Sonia's sister, Maria, testified that defendant was upset when visiting her house the day after the murders. He was curled up on the floor, screaming and grabbing at a neighbor who sat nearby. Defendant's other witness, Criminalist Beverly Kerr, indicated that serological testing was not performed on every bloodstain found on the Disney shirt or near defendant's car at the crime scene.[4]

## II. Penalty Evidence

## A. *Prosecution Case*

Evidence was introduced about the effect of Sonia's murder on persons close to her. Sonia's parents and two sisters described Sonia as a loving, giving, and devoted member of a close-knit family, which continued to mourn her loss. They testified that she fought to overcome her own illnesses and insecurities, worked hard at home and the office, and sought to improve herself to provide a better life for her son, Michael. According to these witnesses, Michael, who was five years old at the time of trial, suffered from memories of seeing his father kill his mother and grandmother, and yearned for his mother's love. Also, Sonia's wit, drive, tenacity, and generosity were described by Martha Dominguez, the Bank manager who hired Sonia and became her close friend. The jury saw a video showing still photographs of both murder victims.

---

[4] Codefendant Lee testified on her own behalf, and denied involvement in the murders. She described a tumultuous affair with defendant, including odd sex practices, financial problems, and disputes with Sonia and Doris. According to Lee, she and defendant argued 10 days before the crime, and tried to reconcile at Universal on May 6, 1995. On May 14, the night of the murders, she agreed to meet defendant, Sonia, and Doris at Universal to discuss future plans. Lee testified that she parked near defendant's car, and looked for the group in the Mall, but never saw them. Back in her car, she fell asleep and awoke when some unknown person, possibly a carjacker, grabbed and attacked her. She sped away, and stopped along Highway 170, injured and in pain. Lee denied stabbing the victims or disposing of any evidence, and had no memory of being stabbed or possessing bloody items from the crime scene. A psychologist described possible emotional reasons for Lee's amnesia. Lee's other witnesses, some of whom testified for the prosecution, indicated that two bloodstained washcloths were found near callbox 166 on Highway 170 two weeks after the crime. On rebuttal, the prosecution linked bloodstains on one of the washcloths to Lee.

## B. *Defense Case*

Defendant, who was 30 years old at the time of the crime, called three male friends from his boyhood. They described his hobbies (e.g., computers, science fiction, and Disneyland), compassion (e.g., helping neighbors after an earthquake), and family ties (e.g., grieving when his father died in the early 1990's).

Defendant's manager at the Bank from 1989 to 1993 testified that he was a model employee who volunteered for charitable events. Similar testimony was given by a married couple who employed defendant in their photography studio starting when he was in high school. Shortly before the murders, defendant and codefendant Lee had visited this couple and spoke about starting a photography business.

Defendant called a female friend of Lee's who testified that Lee said defendant made her feel happy.[5]

### III. PRETRIAL ISSUES

## A. *Jury Selection*

### 1. *Procedural Background*

Jury selection started with about 450 prospective jurors. Consistent with the law at the time, the trial court conducted all questioning. (See *People v. Stitely* (2005) 35 Cal.4th 514, 537, fn. 11 [26 Cal.Rptr.3d 1, 108 P.3d 182] (*Stitely*).) It occurred in four stages.

The first stage involved screening for financial and physical hardship, and exposure to pretrial publicity. Because the pool initially was so large, prospective jurors were divided into smaller groups at the start of this phase. Each group of prospective jurors received special instructions when they first entered the courtroom. As discussed further below, they learned that the case involved two killings at Universal on Mother's Day 1995, and that defendant had been charged with two murder counts and three special circumstance allegations.

---

[5] Codefendant Lee, who was about 15 years older than defendant, presented testimony from female relatives and a female friend that Lee suffered verbal and physical abuse by her father, sexual abuse by her grandfather, physical abuse by her first husband, and marital strife with her second and third husbands. The psychologist who testified for Lee at the guilt phase opined that she was traumatized by past abuse, that she found emotional refuge with defendant (despite their odd sex life), and that she went into a dissociative state and suffered amnesia following a fight with defendant before the capital crime.

Second, the trial court conducted preliminary death penalty screening. In this phase, prospective jurors completed a four-question form asking whether they would refuse to sustain either a murder conviction or the special circumstances to avoid a penalty phase, or would automatically impose a death sentence or life without the possibility of parole (LWOP) regardless of the aggravating and mitigating evidence.[6] They were orally examined, and some were excused for cause, based on their answers on this preliminary death penalty questionnaire.

The third phase involved general voir dire of the 100 or so prospective jurors who survived the first two rounds. They completed the lengthy main questionnaire covering many topics, including the death penalty.[7] The court instructed them again on the two murder counts and the three special circumstances. It also named both victims. The court then randomly called a series of 12 people into the jury box, and examined them individually and as a group. Except for personal matters, voir dire was not sequestered. The court urged counsel to suggest additional or clarifying questions. The court asked many of counsel's questions, and resolved excusals for cause.

In the fourth and final stage, both sides took turns exercising peremptory challenges. Although the panel had been previously "passed" for cause, the court asked questions about the death penalty and other things, and solicited additional questions from counsel in every case. It also resolved new challenges for cause. Whenever a prospective juror was excused, a replacement was selected, and peremptory challenges resumed at random against the 12 people in the box. Defendant exhausted his peremptory challenges, and unsuccessfully sought 14 more to compensate for those he had used when the court denied his challenges for cause.[8] Defendants then unsuccessfully

---

[6] Questions No. 1 and No. 2 asked whether, despite evidence showing beyond a reasonable doubt that the defendant was guilty of first degree murder and that an alleged special circumstance was true, the prospective juror would "REFUSE to vote" to sustain the murder or special circumstance charge, respectively, "in order to avoid the possibility of a penalty phase." Questions No. 3 and No. 4 asked whether, assuming a penalty trial occurred, the prospective juror would "AUTOMATICALLY vote" for death or LWOP, respectively, "regardless of the evidence in aggravation and/or mitigation."

[7] Of the 70 questions appearing on this form, 30 concerned capital punishment. For example, prospective jurors were asked to describe their general views of the death penalty, whether such views would interfere with their ability to be objective at the guilt phase or to consider imposing either death or LWOP at the penalty phase, and whether an intentional killing should always or never trigger the death penalty.

[8] Here, as in other capital trials involving multiple defendants, defendant and codefendant Lee received 20 peremptory challenges that were "exercised jointly," as well as five additional challenges apiece that were "exercised separately." (Code Civ. Proc., § 231, subd. (a).) The People received, in turn, 20 peremptory challenges, plus "additional challenges equal to the number of all the additional separate challenges allowed the defendants." (*Ibid.*) Defendant

claimed the prosecution had exercised its peremptory challenges in a discriminatory fashion under *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*). Questioning resumed, involving one prospective juror. Without exercising any more peremptory challenges, codefendant Lee and the prosecutor accepted the panel as constituted. Twelve jurors and four alternates were sworn.

### 2. Limits on Voir Dire

During the initial or hardship/publicity phase of voir dire, defendant moved orally and in writing to amend the court's preliminary questionnaire. As noted, the four questions on that form targeted prospective jurors who would never allow the case to proceed to a penalty phase, or who would always vote for death or LWOP. Under defendant's proposed amendment, the first two questions, which asked about refusing to return a murder conviction or to sustain special circumstances, referred to "[two] counts" of "premeditated" murder, and identified the three special circumstances as "lying in wait," "financial gain," and "multiple murder." Defendant's other two questions, which asked about voting automatically for death or LWOP, similarly differed from the court's version by identifying the "premeditated" nature of the murder and the special circumstances ("lying in wait," "financial gain," and "multiple murder[]").[9]

Defendant argued that he was entitled to delve into specific facts at this early stage to adequately identify "automatic death" jurors. He emphasized that "two homicides" were alleged. The prosecutor disagreed. He observed that the court's questionnaire generally conformed to *Witherspoon v.*

---

unsuccessfully requested more peremptory challenges than those prescribed by statute both before and near the end of this phase of jury selection.

[9] Defendant's questions read in full as follows: (1) "If the evidence convinces you beyond a reasonable doubt that the defendant is guilty of 2 counts of murder of the first degree, i.e., willful, deliberate, and premeditated [murder] with special circumstances, would you nevertheless <u>REFUSE</u> to vote that (he) (or) (she) was guilty of murder of the first degree in order to avoid the possibility of a penalty phase in the trial?" (2) "If the evidence convinces you beyond a reasonable doubt that the defendant was convicted of first degree willful, deliberate, and premeditated murder and that a special circumstance of lying in wait, financial gain, or multiple murder alleged was true, would you nevertheless <u>REFUSE</u> to vote that the special circumstance was true in order to avoid a penalty phase in the trial?" (3) "If there is a penalty phase in this trial, and you had already found willful, deliberate[,] and premeditated murder with special circumstances of lying in wait, financial gain[,] or multiple murder[], would you, regardless of the evidence in aggravation and/or mitigation, <u>AUTOMATICALLY</u> vote for the penalty of death?" and (4) "If there is a penalty phase in this trial, and you had already found willful, deliberate[,] and premeditated murder with special circumstances of lying in wait, financial gain[,] or multiple murder[], would you, regardless of the evidence in aggravation and/or mitigation, <u>AUTOMATICALLY</u> vote for the penalty of life in prison without possibility of parole?"

*Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 88 S.Ct. 1770] (*Witherspoon*), concerning the excusal of prospective jurors who would always choose LWOP or death, and that defendant's case-specific factors could be explored later in voir dire.

The court declined to amend its preliminary questionnaire to accommodate the defense. The questionnaire's purpose, the court stated, was to identify those jurors who would always or never vote for death under any circumstance, including special circumstance cases in which only a single murder was alleged.

Nevertheless, the court made clear that it was *not* barring reference to "all the things" counsel had raised. The court assured counsel that it would orally instruct on the murder and special circumstance allegations *before* prospective jurors completed the preliminary questionnaire and answered oral inquiries about it. The court further observed that jurors would have those case-specific factors in mind when they subsequently completed the main questionnaire (which included more death penalty questions), and were examined about those written replies during general voir dire. The court alluded to the standard it would apply at that stage under *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*), which would permit the court to disqualify persons based on their views on capital punishment, even if they would not always choose LWOP or death.

Two days later, codefendant Lee joined defendant in challenging the court's preliminary questionnaire and the decision to leave it unchanged. The court reaffirmed its ruling that case-specific factors would be excluded from the four-question form on the one hand, but that prospective jurors would be instructed on such factors before any death qualification occurred on the other hand. The court explained that it sought to strike a balance in questioning jurors about use of the death penalty in "any case" versus "this case," and that it did not want them to prejudge penalty or undergo "brainwashing."

Later the same day, the court assured the defense that its concerns would be met. "[W]e will find out from these jurors whether[,] if *one or all of these special circumstances . . . are found to be true*, whether without regard to any other evidence that they might hear in mitigation, they would automatically vote for death. *That question will be posed*." (Italics added.) The court indicated that nothing in its earlier ruling was intended to foreclose questioning on the factors the defense had sought to include in the preliminary death penalty questionnaire.

The trial court adhered to the foregoing plan—giving instructions and conducting examinations in the manner proposed to counsel. First, before

answering any written or oral questions on capital punishment, *all* prospective jurors were instructed (in groups) that the case involved the "murder," "killing," or "death" of two people, or "women," whose bodies were found in the Universal garage on Mother's Day 1995. At the same time, before death qualification began, the court described the charges to all prospective jurors. They learned that defendant had been charged with two counts of first degree premeditated murder and three special circumstances—multiple murder, murder committed for financial gain, and murder perpetrated while lying in wait.[10]

Second, the same facts and charges arose during the oral examination. As to everyone who answered "yes" to any of the four questions on the preliminary death penalty questionnaire, the court asked whether they would always vote for or against LWOP or the death penalty if allegations of premeditated murder with one or more special circumstances were sustained.[11] Similar exchanges occurred during both general voir dire and the peremptory challenge phase, where answers on the main questionnaire indicated the person might have difficulty voting for a particular penalty. In some instances, the court inquired about the person's views on penalty assuming defendant was convicted of first degree murder and one or more special circumstances were found true.[12] At other times, the oral examination focused

---

[10] This instruction, which was read to the first group of prospective jurors and later given in the same basic form to all the other groups, stated that they must decide whether defendant "is guilty of murder of the first degree, which means a murder that is willful, deliberate, and premeditated, not accidental, inadvertent, that sort of thing, but calculated, planned . . . . [I]n this case the special circumstances are three in number . . . . [¶] First there is an allegation that the murder was committed for financial gain. Second, it is alleged that the murder was perpetrated by lying in wait. And third, there is a special circumstance which is being convicted of more than one charge of murder in the same trial."

[11] For example, the first prospective juror who underwent this process circled "yes" when asked on the preliminary death penalty questionnaire whether he would automatically vote for LWOP regardless of the evidence at the penalty phase. The court then asked him the following question: "[J]ust as a hypothetical, if someone['s] entire family was killed in the Nazi holocaust and they felt that there was some individual who was party to that . . . and there was a trial, and it was found to be first degree murder and they did it by *lying in wait, so [at least one] special circumstance was found to be true*, you would still be voting for life." (Italics added.) The juror answered in the affirmative. After further questioning, during which the juror adhered to his LWOP stance, he was excused for cause.

[12] For example, one of the first prospective jurors to undergo general voir dire indicated on the main questionnaire that his views on the death penalty would likely influence his vote at the guilt phase. When asked about this answer, the juror explained that he was opposed to the death penalty, would always choose LWOP over death, and had no doubts on the issue. In the process, the court asked whether such views would change if *"one or more special circumstances were found to be true,"* and if aggravation outweighed mitigation. (Italics added.) The person answered in the negative, and was ultimately excused for cause.

more specifically on premeditated murder, multiple murder, and murder involving financial gain and lying in wait.[13]

Despite these developments, defendant and codefendant Lee never stopped complaining about the court's ruling. For instance, during voir dire on the preliminary questionnaire, counsel faulted the court for not being "more case specific about people who would automatically give death." Counsel also noted later, during general voir dire, that jurors had not been asked point-blank whether they would "always" impose death under the circumstances the defense had tried to include in the initial questionnaire, e.g., "murdering two people for financial gain." At one point, counsel recognized that he was testing the court's patience and essentially apologized for rehashing the issue.

On appeal, defendant repeats his claim that the trial court erred in limiting reference to "case specific factors" he sought to include in the preliminary questionnaire, namely premeditated multiple murder, lying in wait, and financial gain. Defendant insists that several challenges for cause were erroneously denied as a result, and that he was forced to use peremptory challenges to ensure that none of these persons sat on the jury. The "flip side" of this argument also is raised. Defendant complains that prospective jurors were not asked whether they would always impose LWOP in such specific cases, and that various prosecution challenges for cause were thus errone-ously granted over defense objection. Here, as in the trial court, defendant claims violations of his right to due process and to a fair and impartial jury under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution, and parallel state constitutional provisions.

■ At the time of defendant's trial, as now, qualifications to serve on a capital jury were not limited to determining whether the person opposed or supported the death penalty in every case. Then, as now, both federal and state law permitted the excusal for cause of a prospective juror whose views on capital punishment would " 'prevent or substantially impair the perfor-mance of his duties as a juror in accordance with his instructions and his oath.' " (*Witt, supra,* 469 U.S. 412, 424, fn. omitted.) In articulating this standard, the high court made clear that *Witt, supra,* at page 424, "clarif[ied]"

---

[13] For example, one female prospective juror wrote on the main questionnaire that the death penalty was appropriate for someone who "kills another person simply for financial gain." This answer prompted the court to examine the woman to determine whether she would always impose death in such cases, and whether she would consider evidence in mitigation. The court engaged in similar dialogues during general voir dire with persons whose questionnaires indicated that they understood the case involved "lying in wait," as well as "financial gain," or who wrote that they would consider whether the murders were "planned" or "premeditated" at sentencing. Other prospective jurors were examined about statements in their questionnaires regarding the appropriate penalty for "multiple" or "serial" murderers whose actions result in the death of "several people."

*Witherspoon* by allowing excusals for cause in a potentially broader range of circumstances, that is, even where the prospective juror has not made it "unmistakably clear" that he would *"automatically"* vote a certain way. (*Witherspoon, supra*, 391 U.S. 510, 522, fn. 21.)

 The trial court has considerable discretion to place reasonable limits on voir dire (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1120 [63 Cal.Rptr.3d 297, 163 P.3d 4] (*Zambrano*)), and to determine the number and nature of questions on the death penalty. (*Stitely, supra*, 35 Cal.4th 514, 540.) We have explained that death-qualifying voir dire seeks to determine prospective jurors' attitudes about capital punishment only in the abstract, and whether, without knowing the specifics of the case, they have an open mind on penalty. (*Zambrano, supra*, 41 Cal.4th at p. 1120, quoting *People v. Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr. 399, 789 P.2d 127].) Thus, a defendant cannot insist upon questions that are " 'so specific' " that they expose jurors to the facts of the case, or tempt them to prejudge penalty based on the aggravating and mitigating evidence. (*Zambrano, supra*, 41 Cal.4th at p. 1121, quoting *People v. Cash* (2002) 28 Cal.4th 703, 721–722 [122 Cal.Rptr.2d 545, 50 P.3d 332] (*Cash*).)

Nevertheless, voir dire cannot be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair their performance under *Witt, supra*, 469 U.S. 412, 424. Rules have developed to balance the competing interests. Thus, on the one hand, the trial court cannot bar questioning on any fact present in the case "that could cause some jurors *invariably to vote for the death penalty*, regardless of the strength of the mitigating circumstances." (*Cash, supra*, 28 Cal.4th 703, 721, italics added.) But the court's refusal to allow inquiry into such facts is improper only if it is *"categorical"* (*People v. Vieira* (2005) 35 Cal.4th 264, 286 [25 Cal.Rptr.3d 337, 106 P.3d 990] (*Vieira*), italics added) and denies *all* "opportunity" to ascertain juror views about these facts. (*Id.* at p. 287.)

In *Cash*, the defense sought to determine whether prospective jurors could consider LWOP for someone who had "killed more than one person"— alluding to anticipated penalty phase evidence that, when he was a juvenile, the defendant had murdered his grandparents. (*Cash, supra*, 28 Cal.4th 703, 719.) The trial court concluded that because this circumstance appeared nowhere in the information, it could not be disclosed to prospective jurors and no questioning on the topic would be allowed. (*Ibid.*) The ruling was enforced at every phase of voir dire. (See *id.* at pp. 721–722.) On appeal, this court reversed the death judgment—our lone reversal for limiting death penalty inquiry into case-specific facts. We explained that the nature of the error prevented us from determining whether any seated juror "held the disqualifying view that the death penalty should be imposed invariably and

automatically on any defendant who had committed one or more murders other than the [charged] murder." (*Id.* at p. 723.)

We reached a different result in *Vieira, supra,* 35 Cal.4th 264. There, before voir dire began, the defendant moved to modify the court's questionnaire to ask whether prospective jurors would automatically impose death if they convicted him of " 'two or more murders.' " (*Id.* at p. 284.) The court did not include this question in the written questionnaire, or ask about multiple murder during oral questioning about the death penalty. *Vieira* itself does not make clear whether the court read the information alleging multiple murder to prospective jurors beforehand. Nevertheless, this court found no violation of *Cash, supra,* 28 Cal.4th 703. We emphasized that the trial court never ruled or otherwise suggested that prospective jurors could not be asked, during general voir dire, the multiple-murder question excluded from the written questionnaire. "[R]efusal to include the question [in the written form] was not error so long as there was an opportunity to [orally] ask the question during voir dire." (*Vieira, supra,* 35 Cal.4th at p. 287.)

The gravamen of *Cash* and *Vieira*—both of which were decided after defendant's trial—is that the defense cannot be categorically denied the opportunity to inform prospective jurors of case-specific factors that could invariably cause them to vote for death at the time they answer questions about their views on capital punishment. By definition, such an opportunity arises where the trial court instructs all prospective jurors on such case-specific factors before any death qualification begins. It is logical to assume that when prospective jurors are thereafter asked (orally or in writing) whether they would automatically vote for life or death regardless of the aggravating and mitigating circumstances, they have answered the question with those case-specific factors in mind, and are aware of the factual context in which the exchange occurs. This assumption seems all the more reasonable where answers given orally in open court refer to the specific facts and charges contained in the court's instruction and indicate that they are being taken into account.

Here, we assume solely for the sake of argument that premeditated murder committed while lying in wait and for financial gain are potentially inflammatory circumstances analogous to multiple murder and prior murder, that they could transform an otherwise death-qualified juror into one who could not decide penalty fairly, and that exploration of juror attitudes about the death penalty in such cases cannot be wholly disallowed. (See *Zambrano, supra,* 41 Cal.4th 1082, 1122 [declining to treat issue of victim's dismemberment in such a manner].) Even so, under the unique circumstances of this case, no error occurred.

Contrary to what defendant suggests, the trial court never ruled that prospective jurors were prohibited from learning about the foregoing circumstances or from considering them when expressing their views on capital punishment. Although it denied defendant's motion to include any case-specific factors in the preliminary questionnaire, the court kept its promise to counsel and told all prospective jurors about the specific facts and charges the defense had sought to include therein. Thus, jurors knew the case involved two counts of premeditated murder and the three special circumstances of multiple murder, lying in wait, and financial gain. The court also conveyed this information *before* anyone completed either the preliminary or general questionnaire, and *before* jurors were orally examined about their answers on either written form. A significant number of prospective jurors indicated in the nonsequestered presence of their colleagues, in response to instructions that they all received, that they were taking these case-specific factors into account when asked orally and in writing whether they would automatically vote a certain way.

We are thus satisfied that the court's procedures in this case were adequate to ascertain the prospective jurors' attitudes on case-specific factors that might disqualify them to participate in a capital trial. No error under *Cash, supra,* 28 Cal.4th 703, or *Vieira, supra,* 35 Cal.4th 264, occurred.[14]

### 3. *Denial of Challenge for Cause/Pretrial Publicity*

Defendant claims the trial court abused its discretion by not excusing Prospective Juror J.D. for cause. He also asserts violations of his right to due process and to a representative jury, but does not state whether the federal or

---

[14] Though the briefs are far from clear on this point, defendant suggests the trial court erred in refusing to ask whether prospective jurors' views on penalty would be affected if one of the murder victims was defendant's mother. However, defendant did not include this topic in his motion to amend the trial court's preliminary death penalty questionnaire—the ruling under review here. Nor was matricide mentioned in counsel's ensuing complaints to the court after it denied that motion. Indeed, in his reply brief on appeal, defendant emphasizes a point towards the *end* of voir dire (i.e., during the peremptory challenge phase), when the court asked a male prospective juror, who was single and lived with his mother, whether he favored a guilty verdict for someone "charged with murdering his mother as opposed to murdering some other person." Defense counsel challenged the juror for cause because of "parallels" between his situation and defendant's, and because the juror favored death for premeditated murders. However, notwithstanding Justice Werdegar's dissenting view, nothing in this exchange, or in any other voir dire allusion to family ties, persuades us that defendant ever asked the court to decide below that matricide or intrafamilial murder was one of those rare circumstances which, like multiple murder or prior murder, could cause any juror invariably to vote for death, and which must be disclosed to all prospective jurors before death qualification begins. (See *Cash, supra,* 28 Cal.4th 703, 721, 723.) Hence, the claim is forfeited, and we do not address it on the merits here. (See *People v. Robinson* (2005) 37 Cal.4th 592, 639 [36 Cal.Rptr.3d 760, 124 P.3d 363] [failure to object and suggest changes to written and oral questions during death qualification forfeits complaints about their scope and content].)

state Constitution is involved. In any event, the argument on appeal, as in the trial court, is that exposure to news stories about the crime biased J.D. against defendant on the issue of guilt. We disagree.[15]

On the main questionnaire completed before general voir dire (i.e., the third phase of jury selection), question No. 35 asked, "Before coming here today, did you have opinions or beliefs whatsoever about this case?" Prospective Juror J.D. answered, "From newspaper accounts at [the] time and due to details of story[,] I believed that both defendants were directly involved in murder for financial gain. Also, there had been a planned out plot for these murders. Finally, committing the murders on Mother's Day showed marked anger and hate directed to victims." In a related vein, question No. 36 asked for the nature and source of any pretrial information to which prospective jurors had been exposed. J.D. again mentioned news reports of a financially motivated double murder in a parking structure at Universal on Mother's Day. He also recollected that the victims were related to or associated with one of the defendants.

On voir dire, the trial court asked J.D., a medical laboratory technician, whether his written answers reflected circumstances that he remembered hearing or seeing in the media, or whether—as suggested on his questionnaire—he actually believed they were true. Without apparent hesitation, J.D. clarified his written answer to question No. 35, saying, "I would have reworded that[;] rather than saying 'I believe' is [sic] I recollect from the story." J.D. confirmed that he did not believe everything contained in media accounts, that such accounts were not evidence in the present case, that he would adjudicate the case no differently than if he had heard nothing about the crime, and that he would rely solely on the evidence presented at trial. J.D. insisted that he would be fair and impartial, and cited his need to be neutral at work in balancing the competing demands of others.

Defendant moved to excuse J.D. for cause because he "believes that the defendants are guilty" based on pretrial publicity. The motion was denied.

---

[15] As to this and certain other appellate claims, defendant contends that an issue raised and decided in the trial court resulted in constitutional violations, but he did not present those constitutional theories below. In such instances, it appears that (1) the appellate claim is the kind that required no trial court action to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court was asked to apply, but merely assert that the trial court's act or omission, in addition to being wrong for reasons actually presented to that court, had the legal consequence of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581] (*Boyer*), applying *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765].) No separate constitutional discussion is required, or provided, where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here.

The trial court said it accepted J.D.'s assurances that news stories involved only allegations, not evidence. The court also credited J.D.'s explanation that he was imprecise in answering question No. 35, and that he should have written that he *recalled* news accounts about the crime, not that he "believed" their truth or accuracy. Defendant subsequently exercised a peremptory challenge against J.D., who did not serve on the jury.

The foregoing events do not require reversal of the judgment. Preliminarily, defendant has not preserved his claim that Prospective Juror J.D. was biased and should have been excused for cause. Although he exercised a peremptory challenge to remove J.D., and exhausted all such challenges (and asked for more), defendant never expressed dissatisfaction with the jury as constituted. (*People v. Wilson* (2008) 43 Cal.4th 1, 14 [73 Cal.Rptr.3d 620, 178 P.3d 1113]; *People v. Crittenden* (1994) 9 Cal.4th 83, 121 & fn. 4 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Such lapse results in forfeiture of the claim where, as here, the trial occurred in 1997, after *Crittenden* was decided. (*People v. Blair* (2005) 36 Cal.4th 686, 741–742 [31 Cal.Rptr.3d 485, 115 P.3d 1145].) Otherwise, a defendant could challenge denial of a challenge for cause on appeal even if he was satisfied with the overall composition of the jury, and expressed no misgivings to the trial court. (*People v. Weaver* (2001) 26 Cal.4th 876, 911 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

■ Moreover, under the principles invoked by defendant, a prospective juror is biased and disqualified to serve only if his state of mind will prevent him from acting impartially and without prejudice to any party. (*People v. Ayala* (2000) 24 Cal.4th 243, 271–272 [99 Cal.Rptr.2d 532, 6 P.3d 193] (*Ayala*); see *People v. Ledesma* (2006) 39 Cal.4th 641, 668–669 [47 Cal.Rptr.3d 326, 140 P.3d 657], citing Code Civ. Proc., § 225, subd. (b)(1).) If the prospective juror's statements are equivocal or conflicting, the trial court's determination of his state of mind is binding on appeal. (*Ayala, supra,* 24 Cal.4th at p. 272, citing *People v. Carpenter* (1999) 21 Cal.4th 1016, 1035 [90 Cal.Rptr.2d 607, 988 P.2d 531].) The trial court is in the best position to make this assessment, since it can observe demeanor and tone, and decide credibility firsthand. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1175 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

Here, nothing J.D. said in court indicated that he was biased against defendant or disqualified to serve based on news stories about the capital crime. J.D. candidly disclosed that he remembered learning about allegations of multiple murder against defendant, and stated unequivocally that he did not accept them as true and had not prejudged guilt. As noted by the trial court, such answers arguably conflicted with one response J.D. provided on his written questionnaire before the oral examination. As noted, where assessment of the juror's state of mind depends upon the resolution of any

conflicting or ambiguous statements and upon a credibility determination, we defer to the findings of the trial court. Here, the court explicitly credited J.D.'s in-person statements clarifying his written questionnaire and insisting that he remained open-minded and fair about the case. We therefore conclude that the court did not abuse its discretion in finding no bias on J.D.'s part, and in denying defendant's challenge for cause.

### 4. Wheeler/Batson *Claim*

As noted, near the end of jury selection, defendant exhausted his peremptory challenges and failed to persuade the trial court to grant more. Codefendant Lee, joined by defendant, then moved under both *Wheeler, supra,* 22 Cal.3d 258, and *Batson, supra,* 476 U.S. 79, to dismiss the panel of prospective jurors and start jury selection anew. They argued that the prosecution had exercised most of its peremptory challenges against female prospective jurors (i.e., 20 of 23), and that such conduct was discriminatory and unconstitutional under state and federal law. (See *J. E. B. v. Alabama ex rel. T. B.* (1994) 511 U.S. 127, 129 [128 L.Ed.2d 89, 114 S.Ct. 1419]; *People v. Jurado* (2006) 38 Cal.4th 72, 104 [41 Cal.Rptr.3d 319, 131 P.3d 400].)

The trial court initially expressed conflicting views on the matter. On the one hand, the "numbers" did not surprise the court, because women "predominate[d]" in the pool of prospective jurors and more women than men were likely to be excused as a result. On the other hand, the court stated that while it was inclined to deny the *Wheeler/Batson* motion without prejudice, it would require the prosecution to explain its reasons for exercising any peremptory challenges against women "[f]rom this point forward."[16]

Seeking clarification, the prosecutor asked whether the court had found a prima facie *Wheeler/Batson* violation. "[I]f the court is not finding a prima facie case," said the prosecutor, "the People should [not] have to justify anything." The prosecutor denied any gender bias. No mention of specific jurors or reasons for excusing them was made.

The trial court acknowledged that it was not prepared to "determine whether there [was] a prima facie case" at that time. Hence, the court deferred a decision on the issue until after it had carefully examined its notes

---

[16] The trial court also expressed concern that the *Wheeler/Batson* motion was untimely, because defendant did not bring it until the peremptory challenge process was almost complete and the jury was on the verge of being sworn. The Attorney General does not make a timeliness argument on appeal, and we do not address the point. (See, e.g., *Zambrano, supra,* 41 Cal.4th 1082, 1104, fn. 2, and cases cited.)

and the record. Jury selection then resumed. Later the same day, the 12-person jury panel was sworn. A few days later, four alternate jurors were sworn.

The *Wheeler/Batson* motion was ultimately denied during the prosecution's case at the guilt trial. The court adopted the prosecution view, and rejected the contrary defense claim, that no prima facie case of purposeful gender discrimination had been made. It ruled as follows: "I have analyzed the pattern of peremptories by the People and the background of the jurors who were excused. I have taken into consideration the ultimate makeup of the jury that is hearing this case with respect to their sexes and the range of ages of the sexes, the females. [¶] And I've also considered the fact that, as is usually the case and was again here, the majority of representation is women on the panel as a whole, and on the basis of that, I find no indication of any concern . . . with respect to the *Wheeler* motion aspects. There just is no basis for it, and the motion is denied."

Defendant renews his *Wheeler/Batson* claim on appeal. He insists denial of the motion violated his rights to due process, equal protection, and a representative jury under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution, and under applicable state constitutional provisions. No error occurred.

██ Critical here is whether defendant established a prima facie case of purposeful discrimination. In this first stage of any *Wheeler/Batson* inquiry, the burden rests on the defendant to " 'show[] that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' " (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410]; accord, *Miller-El v. Dretke* (2005) 545 U.S. 231, 239 [162 L.Ed.2d 196, 125 S.Ct. 2317] (*Miller-El*); *Batson, supra*, 476 U.S. 79, 96.) In other words, this is not a case in which, *after* a prima facie case is found, the state must offer permissible nondiscriminatory reasons for the strikes (i.e., the second stage of the *Wheeler/Batson* analysis), or the trial court must decide whether the defendant has carried his burden of showing the discriminatory use of such strikes (i.e., the third stage of the analysis). (*Johnson v. California, supra*, 545 U.S. at p. 168.) Indeed, as the prosecutor indicated below, he was not obliged to disclose such reasons, and the trial court was not required to evaluate them, unless and until a prima facie case was made. (*Zambrano, supra*, 41 Cal.4th 1082, 1104–1105 & fn. 3; see generally *People v. Bell* (2007) 40 Cal.4th 582, 596 [54 Cal.Rptr.3d 453, 151 P.3d 292] (*Bell*).)

Defendant correctly observes that the trial court's finding that he failed to establish a prima facie *Wheeler/Batson* violation must be reviewed in light of intervening legal developments. In *Johnson v. California, supra*, 545 U.S.

162, the United States Supreme Court reversed *People v. Johnson* (2003) 30 Cal.4th 1302 [1 Cal.Rptr.3d 1, 71 P.3d 270], in which we confirmed that the relevant California standard—even if it sometimes had been expressed as a " 'reasonable inference' " (*People v. Johnson, supra,* 30 Cal.4th at p. 1312)— was to show that it was "more likely than not" that purposeful discrimination had occurred. (*Id.* at p. 1318.) The high court has since disapproved this exacting standard for federal constitutional purposes, and has said that a prima facie burden is simply to "produc[e] evidence sufficient to permit the trial judge to draw an inference" of discrimination. (*Johnson v. California, supra,* 545 U.S. at p. 170.)

Where, as here, it is not clear which standard the trial court used, we independently determine whether the record permits an inference that the prosecutor excused jurors on prohibited discriminatory grounds. (*Bell, supra,* 40 Cal.4th 582, 597.) Defendant argues that the statistical disparity between the number of prosecutorial strikes used against men and women establishes a prima facie inference of discriminatory motive. Under the particular circumstances of the case, we disagree.

At the first opportunity to exercise a peremptory challenge, the prosecution accepted the panel, consisting of five women and seven men. The defense declined to follow suit, and the process of exercising alternating peremptory challenges began.

In the ensuing round, the defense jointly excused two women and three men, and the prosecution excused four women. The prosecution accepted the panel, which then consisted of eight women and four men. The defense did not find the panel acceptable at that point.

As the back-and-forth peremptory process continued, defendants jointly excused three women and two men, and the prosecution excused four women. Next, when the panel consisted of seven women and five men, the prosecution excused a man.

Thereafter, defendants jointly excused a man. For the third time, the prosecution accepted the panel, which again consisted of eight women and four men. The defense did not choose to do so.

In the next go-around, defendants jointly excused three women and one man, and the prosecution excused three women. When the panel thereafter consisted of eight women and four men, the prosecution excused a man.

Defendants then jointly excused two women, interspersed with the prosecution's excusal of one woman. For the fourth time, the prosecution

accepted the panel, which then consisted of six women and six men. Again, the defense did not follow suit.

Defendants jointly excused one woman and, for the fifth time, the prosecution accepted the panel, then consisting of five women and seven men. Defendants responded by jointly excusing one man. For the sixth time, the prosecution accepted the panel, again consisting of five women and seven men.

Defendants then jointly excused one man, the prosecution excused one woman, and codefendant Lee excused one man. For the seventh time, the prosecution accepted the panel, then consisting of six women and six men.

Next, defendant excused one woman. Then, when the panel consisted of five women and seven men, the prosecution excused a man. Codefendant Lee followed by excusing one man and, for the eighth time, the prosecution accepted the panel, consisting of five women and seven men. Defendant responded by excusing two men and one woman. Codefendant Lee excused two men, and the prosecution excused four women.

Thereafter, between the prosecution's excusal of one woman and defendant's excusal of one man, codefendant Lee accepted the jury. The prosecution excused one woman, codefendant Lee accepted the jury, and the prosecution excused one more woman. It was at that point that defendants objected under *Wheeler/Batson*, and the court took under submission the question whether they had made a prima facie case. Then, defendant having exhausted his peremptory challenges, and codefendant Lee and the prosecution having accepted a panel of five women and seven men, those 12 jurors were sworn.

In sum, after initially accepting the panel without exercising any peremptory challenges at all, the prosecutor accepted the panel *eight additional times* with seeming disregard for the number of females or the ratio of female to male jurors. On two such occasions, the prosecution was willing to have defendant tried by a jury of eight women and four men. Two other times, there were six men and six women in the jury box—another split suggesting men were not being favored over women. The prosecution chose, on two more occasions, to peremptorily excuse a man when the panel consisted of seven or more women.

In our view, the prosecution's pattern of excusals and acceptances during the peremptory challenge process reveals no obvious discrimination towards

female jurors and is patently inconsistent with any such inference. Hence, the trial court did not err in finding no prima facie *Wheeler/Batson* violation.[17]

Defendant next argues the trial court erred in not conducting a comparative juror analysis and that we must perform this function for the first time on appeal. However, for reasons we have recently explained, it is not necessary or appropriate for us to speculate as to the reasons that may have motivated the prosecutor's challenges. (*Bell, supra,* 40 Cal.4th 582, 600.) Nor does *Miller-El, supra,* 545 U.S. 231, 241–252, decided after defendant's trial, mandate such an analysis under the present circumstances. (*Bell, supra,* 40 Cal.4th at p. 601.)

■ In a "first-stage *Wheeler-Batson* case, comparative juror analysis would make little sense. In determining whether defendant has made a prima facie case, the trial court did not ask the prosecutor to give reasons for his challenges, the prosecutor did not volunteer any, and the court did not hypothesize any. Nor, obviously, did the trial court compare the challenged and accepted jurors to determine the plausibility of any asserted or hypothesized reasons. Where, as here, no reasons for the prosecutor's challenges were accepted or posited by either the trial court or this court, there is no fit subject for comparison." (*Bell, supra,* 40 Cal.4th 582, 600–601.) "Whatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his strikes are pretextual, it has little or no use where the analysis does not hinge on the

---

[17] After reviewing the questionnaires and voir dire of each woman the prosecutor excused, Justice Kennard finds potential nondiscriminatory reasons for the excusal of all but one such panelist, and thus commendably agrees that no prima facie case of gender bias arose. In *People v. Bonilla* (2007) 41 Cal.4th 313, 345–349 [60 Cal.Rptr.3d 209, 160 P.3d 84] (*Bonilla*), we used a similar methodology to reject an arguable inference of discrimination, but nothing in our case law suggests, as Justice Kennard would have it, that this is the *only* valid means of doing so. Justice Kennard certainly fails to persuade us that our own approach is flawed in this regard. Justice Kennard insists we may not infer a lack of gender bias from the prosecutor's acceptance, several times, of a jury in which women equaled or exceeded men in number. She speculates that the prosecutor could safely assume such acceptances would not really end the selection process to the extent the defense had available challenges remaining. The prosecutor, she ventures, may simply have been trying to save his own challenges to ensure the most favorable—i.e., the most gender-biased—possible jury at the end of the process. But to speculate, without evidentiary support, that the prosecutor's acceptances were insincere, and that his tactics unfairly targeted women, ignores a simple reality. On each such occasion, the defense could easily have accepted the same female-laden panels. In short, the prosecutor ran the repeated and genuine risk of ending up with a jury consisting largely of women. Such evidence provides powerful support for our conclusion that the prosecutor's peremptory strikes, though mostly affecting women, were in fact not exercised on the basis of gender alone or in a discriminatory manner.

prosecution's actual proffered rationales, and we [may properly] decline to engage in a comparative analysis" in a first-stage case. (*Bonilla, supra*, 41 Cal.4th 313, 350.)[18]

## B. *Denial of Severance*

Defendant, along with codefendant Lee, moved for severance before trial. Defendant renewed his motion both before and after opening statements at the guilt phase, during the presentation of evidence at the guilt phase, and after the penalty phase, in a motion for new trial. He now contends the trial court erred in denying these motions, thereby violating his federal and state constitutional rights to due process and a fair trial. His theory here, as below, is that the conflicting defenses prejudiced him at every phase of trial, i.e., that while he accused unknown third parties of the murders, Lee suggested that defendant was to blame.

█ The Legislature has expressed a preference for joint trials. (*People v. Avila* (2006) 38 Cal.4th 491, 574 [43 Cal.Rptr.3d 1, 133 P.3d 1076] (*Avila*).) Section 1098 states that multiple defendants jointly charged with a felony offense "must be tried jointly, unless the court order[s] separate trials." This rule applies to defendants charged with " 'common crimes involving common events and victims.' " (*People v. Tafoya* (2007) 42 Cal.4th 147, 162 [64 Cal.Rptr.3d 163, 164 P.3d 590], quoting *People v. Keenan* (1988) 46 Cal.3d 478, 500 [250 Cal.Rptr. 550, 758 P.2d 1081] (*Keenan*).)

However, separate trials *may* be ordered in the face of antagonistic defenses. (*Avila, supra*, 38 Cal.4th 491, 575.) As discussed further below, such conflict exists only where the acceptance of one party's defense precludes the other party's acquittal. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 41 [17 Cal.Rptr.3d 710, 96 P.3d 30] (*Coffman and Marlow*), citing *People v. Hardy* (1992) 2 Cal.4th 86, 168 [5 Cal.Rptr.2d 796, 825 P.2d 781] (*Hardy*).) We review the denial of severance for abuse of discretion—a deferential standard based on the facts as they appeared when the ruling was made. (*Avila, supra*, 38 Cal.4th at p. 575, citing *Hardy, supra*, 2 Cal.4th at p. 167.) A ruling that was correct when made will stand unless joinder causes such " ' "gross unfairness" ' " as to violate defendant's due process rights. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 998 [47 Cal.Rptr.3d 467, 140 P.3d 775] (*Lewis and Oliver*).)

---

[18] We further decline to disturb the trial court's *Wheeler/Batson* ruling based on defendant's assertion that the prosecutor was following an unwritten policy of the Los Angeles County District Attorney's Office to limit women on capital juries because of their willingness to show mercy and to consider mitigating evidence in cases involving intrafamilial conflict and murder. Nothing in the appellate record supports this view. Indeed, defendant relies exclusively on newspaper and law review articles not submitted with his *Wheeler/Batson* motion below or properly presented to this court on appeal.

Contrary to what defendant suggests, this was a " 'classic' case" for joinder. (*Coffman and Marlow, supra*, 34 Cal.4th 1, 40, quoting *Keenan, supra*, 46 Cal.3d 478, 499.) The prosecution claimed that defendant and Lee planned and committed the multiple murder together. Both stood accused in equal measure of the same offenses involving the same special circumstance allegations. The evidence against each defendant was strong. It included their joint visit to the crime scene one week before the murders, their presence and apparent phone contact at the crime scene one hour beforehand, the knife wounds each bore afterwards, and the discovery of the victims' blood on their clothes.

By the same token, statements made by each defendant before or during trial did not implicate the other and, if credited by the jury, would have been mutually exculpatory. In particular, both denied any participation in the murders. Defendant told police and medical personnel at the crime scene that he was attacked on the top floor of the garage by robbers he never saw and could not identify. Similarly, Lee testified at trial that she was stabbed by an unknown assailant while sitting in her car waiting for defendant and the victims in the same location. All of these circumstances, including the compatible nature of each third party culpability defense, strongly supported the court's denial of severance here.

Defendant insists, however, that Lee's counsel provided an alternate theory portraying defendant as the person who murdered Sonia and Doris, and who stabbed Lee. Specifically, in closing argument at the guilt phase, Lee's counsel acknowledged that jurors might not believe that an "unknown gang of thugs" committed the murders. Earlier, in Lee's opening statement, counsel highlighted evidence suggesting that the murders were committed in a rage, that Lee and defendant became estranged the week beforehand, and that Lee had no reason to kill Sonia or Doris. Lee's counsel described his client as one of "three victims."[19]

Even assuming counsel sought to subtly shift blame from Lee to defendant, and such innuendo constituted conflicting defenses under the authorities cited above, severance could properly be denied. We have said that a joint trial is prohibited only where " 'the conflict is so prejudicial that [the] defenses are

---

[19] We note that defendant's attorney, who gave no opening statement at the guilt phase, claimed during closing argument that the prosecution had not proved defendant's role in the murders beyond a reasonable doubt. Counsel questioned the competence of investigators, the reliability of forensic evidence, and the strength of expert testimony. He urged the jury to draw favorable inferences from evidence admitted to prove planning and motive, and from defendant's statements after the crime. Alternatively, counsel argued that the elements of malice aforethought and premeditation required for murder had not been proved insofar as the killings were provoked by various circumstances, including Sonia and Doris's joint efforts to separate defendant from his son, and defendant's financial distress and looming bankruptcy.

irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty.' " (*Hardy, supra,* 2 Cal.4th 86, 168.) "When, however, there exists *sufficient independent evidence* against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." (*Coffman and Marlow, supra,* 34 Cal.4th 1, 41, italics added.)

Independent evidence supported the prosecution theory and implicated defendant in the murders. Before the crime occurred, he blamed the victims for distancing him from his son, and complained about paying Sonia child support, emphasizing his bankrupt state. Defendant drove the victims to their last meal, arriving late at night and parking in a remote spot where the murders occurred. He was found at the crime scene covered in the victims' blood, with knife cuts on his hands. He behaved oddly and made suspicious statements at that time about how the attack occurred. In light of such evidence, any tension between defendants' theories of the case could not alone have produced the guilty verdicts.

Finally, defendant characterizes Lee's testimony as "contrived," and claims he suffered "prejudicial spillover" in the joint trial. For reasons stated above, the trial court was not required to grant severance on this ground. The prosecution presented abundant evidence establishing that defendant murdered the victims as part of a selfish and vengeful plan that he and Lee devised and perpetrated together. Nothing in Lee's defense could have so tainted defendant as to have caused the jury to convict him solely on that ground. No constitutional or other error occurred.

### IV. GUILT ISSUES

#### A. *Ex Parte In Camera Meetings*

The trial judge, Honorable Leslie W. Light, presided over the present case for over 10 months. During that period, the court conferred in camera 10 times with Henry J. Hall, counsel for codefendant Lee, outside the presence of both defendant and his counsel, Ralph A. Courtney III. These hearings were transcribed and sealed in the trial court.

Thereafter, while the case was pending on automatic appeal, defendant filed a motion in this court to unseal or otherwise gain access to the foregoing transcripts. On June 25, 2003, we ordered that three of the transcripts be unsealed (one conference on Nov. 19, 1997, and two conferences on Dec. 2, 1997), and that transcripts of three other conferences remain sealed (Aug. 5, 1997, Mar. 30, 1998, and Apr. 1, 1998). The same order also gave appellate counsel access to reporter's transcripts of four additional conferences (and to

one portion of the sealed clerk's transcript), but declined to unseal such items or allow their use in court papers that were not themselves filed or lodged under seal (conferences on Nov. 10, 1997, Nov. 13, 1997, Jan. 12, 1998, and Mar. 2, 1998).

Defendant's main complaint on appeal is that his absence and the absence of his counsel from the foregoing conferences resulted in violations of his right to counsel, to presence, to due process, and to a fair and public trial under the Sixth and Fourteenth Amendments of the federal Constitution. We will reject the claim.

■ Proceedings held in chambers and outside the presence of a party are generally disfavored. (*Ayala, supra,* 24 Cal.4th 243, 262; see *id.* at pp. 293–294 (dis. opn. of George, C. J.); see also *People v. Prince* (2007) 40 Cal.4th 1179, 1279 [57 Cal.Rptr.3d 543, 156 P.3d 1015] (*Prince*) [openness presumed in public trial guarantee].) However, the trial court retains discretion to conduct in camera, ex parte proceedings to protect an overriding interest that favors confidentiality. (See, e.g., *People v. Gurule* (2002) 28 Cal.4th 557, 593–594 [123 Cal.Rptr.2d 345, 51 P.3d 224] (*Gurule*) [privileged attorney-client information]; *People v. Lawley* (2002) 27 Cal.4th 102, 159 [115 Cal.Rptr.2d 614, 38 P.3d 461] (*Lawley*) [identity of confidential informant]; *Ayala, supra,* 24 Cal.4th at p. 261 [trial strategy]; *People v. Webb* (1993) 6 Cal.4th 494, 516 [24 Cal.Rptr.2d 779, 862 P.2d 779] (*Webb*) [privileged psychotherapy records].)

■ In addition, the federal constitutional right to counsel arises at critical stages of the prosecution or when necessary to assure a meaningful defense. (*United States v. Wade* (1967) 388 U.S. 218, 225 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1069 [119 Cal.Rptr.2d 859, 46 P.3d 335] (*Koontz*).) ■ Likewise, a federal constitutional right to be present in court exists where necessary to protect the defendant's opportunity for effective cross-examination, or to allow him to participate at a critical stage and enhance the fairness of the proceeding. (*People v. Waidla* (2000) 22 Cal.4th 690, 741–742 [94 Cal.Rptr.2d 396, 996 P.2d 46] (*Waidla*), citing *Kentucky v. Stincer* (1987) 482 U.S. 730, 744–745 & fn. 17 [96 L.Ed.2d 631, 107 S.Ct. 2658].) Such protections usually do not cover in camera discussions on matters bearing no reasonable, substantial relation to the defense of the charge. (*People v. Rogers* (2006) 39 Cal.4th 826, 855 [48 Cal.Rptr.3d 1, 141 P.3d 135]; *Waidla, supra,* 22 Cal.4th at p. 742.)

Defendant makes no serious attempt to show a violation of these principles based on the transcripts that we unsealed or otherwise provided to counsel on appeal. He asks us to infer from the sheer number of in camera ex parte proceedings that codefendant Lee's counsel received "unfettered" access to

the trial court, and functioned as a "super-prosecutor" in the case. As so framed, the claim is speculative and fails outright. Indeed, the court met at least three times with *defendant's* attorney in chambers, outside the presence of Lee's counsel, suggesting the procedure was not one-sided or unfair.[20]

In any event, we have carefully reviewed all 10 transcripts sealed at trial and used to support the present claim on appeal. (E.g., *Gurule, supra,* 28 Cal.4th 557, 595; *Lawley, supra,* 27 Cal.4th 102, 160; *Webb, supra,* 6 Cal.4th 494, 518.) The matters discussed in those conferences did not bear directly on the evidence at trial, the conduct of the defense, or the outcome of the case. Nor do the transcripts reveal any attempt by Attorney Hall to curry favor with the trial court or to benefit his client Lee at the expense of defendant.

To the contrary, and as an example, *defendant* instigated the closed proceedings that are the subject of the three transcripts we ordered unsealed on appeal. On those occasions, Hall consulted with the trial court about telephone calls and handwritten notes he had received directly from defendant complaining about his attorney, Courtney, offering to help Lee with her defense, and threatening to commit suicide. The court suggested that Hall should promptly disclose these communications to Courtney and inform defendant that no contact could occur in Courtney's absence. Hall said he took such action. It seems unreasonable for defendant to now complain about ex parte in camera meetings held to ensure that his own actions did not place Lee's counsel in an ethical or tactical bind. No constitutional error occurred.

 Almost as an afterthought, defendant argues in his reply brief on appeal that the proceedings from which he and his counsel were excluded violated the presence requirements set forth in section 977. (*Id.,* subd. (b)(1) [accused must be present at specified proceedings in all felony cases, and must be present "at all other proceedings" unless he executes a written waiver form].) Even assuming such statutory error occurred, it was harmless for the reasons we have set forth above. (See *People v. Rundle* (2008) 43 Cal.4th 76, 134 [74 Cal.Rptr.3d 454, 180 P.3d 224], citing *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

---

[20] The Attorney General suggests defendant has forfeited his right to complain about the ex parte in camera procedure on appeal to the extent he failed to object at trial. However, as the Attorney General recognizes, defendant's counsel was apparently aware of only *three* of these conferences around the time they occurred—the same number of times defendant's counsel appeared in chambers without Lee's counsel. Thus, it appears defendant did not have sufficient information to object below on the precise ground raised here, i.e., that counsel for codefendant Lee "established a practice" of making in camera ex parte presentations to the trial court, and that the total number of these conferences was excessive. We find no forfeiture.

B. *Bankruptcy Consultation*

As discussed below in conjunction with a challenge to the financial-gain special circumstance, the prosecution sought to prove that defendant killed Sonia, at least in part, to avoid paying her $375 a month in court-ordered child support. Over defendant's assertion of the attorney-client privilege, the trial court admitted prosecution evidence that he consulted with a bankruptcy attorney before the capital crime. Defendant now argues that the trial court erred in rejecting his privilege claim. He also asserts a violation of his federal constitutional right to due process and a fair trial. We decline to reverse the judgment on such grounds.

As relevant here, the prosecution called Attorney Rene Lopez de Arenosa to testify that defendant consulted him about bankruptcy shortly before the murders. The prosecutor indicated that because the conversation occurred in front of codefendant Lee, an extraneous third party, it was not confidential or protected under the attorney-client privilege. Defendant disagreed and asserted the privilege, urging the court to hold an evidentiary hearing if it had any doubts. After taking a brief break to research the matter, the court indicated that the issue was close, and agreed to hold a hearing. The court said it tentatively favored the prosecution view, but noted the contrary argument that Lee (though married to someone other than defendant) was living with defendant in an intimate relationship at the time, and was "arguably a putative wife" whose presence at the bankruptcy meeting did not affect confidentiality.

At the ensuing hearing, Attorney Arenosa testified that, in early 1995, he met with defendant and his mother, Doris, to discuss her bankruptcy, and that he once represented defendant in a paternity case. In March or April 1995, defendant made another appointment. He arrived at Arenosa's office with codefendant Lee, calling her his girlfriend.

Arenosa further testified as follows: Lee was present in the room during defendant's 30-minute meeting with Arenosa. The discussion focused solely on defendant's financial condition and discharging his debts in bankruptcy. Defendant showed Arenosa his credit card bills. According to Arenosa, he and defendant spoke in English, except when they discussed specific debts in Spanish. Lee's financial situation was not discussed. Arenosa did not meet with defendant or Lee again, and prepared no bankruptcy documents.

The only other witness at the evidentiary hearing was defendant. He confirmed that the meeting concerned his possible bankruptcy. Defendant testified that one of the bills he mentioned was the Household Finance loan he shared with Lee. Defendant viewed Arenosa as his attorney, wrote him a

check for his services that day, and assumed the conversation was confidential. Defendant recalled that the conversation occurred in English and Spanish, with defendant speaking mainly in Spanish. On cross-examination, defendant admitted that he and Lee had exchanged letters written in a mixture of Spanish and English. He indicated that Lee understood Spanish, and had been studying to learn more.

After the hearing, the court entertained additional argument. Alluding to applicable statutory law, which we discuss below, the prosecutor reiterated that Lee's presence defeated confidentiality between defendant and Arenosa, because there was no reason for her to be at the meeting other than to offer emotional support. Defendant's counsel countered that Lee was present to serve both her and defendant's interests insofar as they were both liable for one of the debts that he might discharge in bankruptcy.

The trial court rejected defendant's claim. It concluded that his bankruptcy planning had nothing to do with Lee, because it concerned only the discharge of his debts. The court explained that Lee "wasn't a necessary party" and she "wasn't there to further [defendant's] interest." Hence, the court agreed with the prosecution, that Lee's presence meant the conversation with Arenosa was not confidential and that it could not be excluded on privilege grounds. However, in an abundance of caution, the court limited the information that Arenosa could disclose to the jury about the meeting, namely, that he met with defendant and Lee on a certain day, and that the discussion with defendant concerned bankruptcy.

Consistent with this ruling, Arenosa testified for the prosecution at trial that defendant and Lee visited his law office in late March or early April 1995, and that he spoke with defendant about bankruptcy. On cross-examination, Lee's counsel elicited that the meeting focused on defendant's, not Lee's, financial state.

■ By statute, a client holds a privilege to prevent the disclosure of his confidential communications with an attorney. (Evid. Code, §§ 952–954.) A person becomes a client when he consults an attorney to retain him or secure legal services or advice. (*Id.,* § 951.) The transmission of information between lawyer and client in the course of that relationship is "confidential" and protected only if it occurs "by a means which, so far as the client is aware, *discloses the information to no third persons other than those who are present to further the interest of the client in the consultation* or those to whom disclosure *is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted.*" (*Id.,* § 952, italics added; see *People v. Gionis* (1995) 9 Cal.4th 1196, 1207 [40 Cal.Rptr.2d 456, 892 P.2d 1199].) Moreover, the client can later forfeit, or

waive, the privilege as to any confidential communication otherwise protected thereunder if he "has disclosed a significant part of the communication or has consented to disclosure made by anyone." (Evid. Code, § 912, subd. (a); see *People v. Barnett* (1998) 17 Cal.4th 1044, 1124 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

Defendant argues here, much as he did below, that even if Lee was not "reasonably necessary for the transmission of the information or the accomplishment of the purpose" of defendant's bankruptcy consultation, she was "present to further [their joint] interest." (Evid. Code, § 952.) In making this argument, defendant emphasizes the applicable Law Revision Commission Comment stating that an attorney-client communication retains its confidential character "even though it is made in the presence of another person— such as a spouse, parent, business associate, or joint client—who is present to further the interest of the client in the consultation." (Cal. Law Revision Com. com., 29B pt. 3 West's Ann. Evid. Code (1995 ed.) foll. § 952, p. 210.) Defendant suggests this principle applies here because Lee was his intimate partner and they shared liability on the Household Finance loan.

We need not, and do not, decide the issue. Even assuming error occurred, it was harmless under any applicable standard. At most, Arenosa's testimony established that defendant, by seeking legal advice about declaring bankruptcy, was deeply concerned about his personal financial state shortly before the capital crime. However, the jury learned in great detail from other witnesses that defendant's debts, including his child support payments, exceeded his assets and income, and that he was having trouble paying his bills. Defendant told one of his supervisors, Moreno, that he was "fucked for the next seven years, because he was going to have to file bankruptcy." Jurors also learned that he had asked one manager at work, Shafer, for a referral to an attorney, alluding to his child support problems. The jury almost certainly would not have reached a different outcome at the guilt phase had the trial court excluded Arenosa's brief and limited testimony confirming that a bankruptcy consultation with him had occurred.

C. *Pathologist's Testimony*

During the prosecution case, the pathologist, Dr. Carpenter, testified that 200 of the 4,000 autopsies he had handled involved knife slayings. He explained that only one of the 200 knife cases involved multiple victims, and that none involved injuries like those Sonia and Doris sustained. Defendant unsuccessfully objected and moved to strike this part of the witness's testimony as irrelevant.

A short time later, the prosecutor took a different tack, asking the pathologist about the "histories" he had received from police and coroner's investigators in both this case and the other 200 knife deaths he had handled. Codefendant Lee summarily objected on hearsay grounds. In his offer of proof, the prosecutor explained that Dr. Carpenter would testify that he had never seen a robbery murder involving knife injuries like those inflicted on Sonia and Doris. The prosecutor indicated that such testimony would undermine defendant's statements to investigators at the crime scene that Sonia and Doris were stabbed to death during a robbery. The court overruled Lee's objection. Dr. Carpenter then testified that, based on case histories from investigators, the 200 knife deaths he examined arose from either barroom brawls or domestic disputes, and that only a few stab wounds were inflicted on each occasion.

Defendant now claims the trial court erred in admitting Dr. Carpenter's testimony insofar as it concerned the nonrobbery nature of the 200 other knife deaths. As support for his inferences about the circumstances of those cases, the witness purportedly relied on information that was not of a "type that reasonably may be relied upon by an expert in forming [his] opinion." (Evid. Code, § 801, subd. (b).) The investigators' case histories in those matters were not a proper basis for expert opinion, defendant insists, because they were preliminary, having been obtained before the investigations in the prior cases were complete or the facts were adjudicated. A federal due process violation from the admission of this evidence is alleged.

Defendant has forfeited this claim by not raising it below. (See Evid. Code, § 803 [authorizing exclusion, "upon objection," of opinion testimony based on improper matter].) The trial court was never presented with the specific objection raised here, and was therefore denied the opportunity to determine whether experts commonly and reasonably rely on the information used by Dr. Carpenter in reaching opinions of the kind he offered. (*Id.,* § 353, subd. (a).) Absent such a record, this court likewise cannot assess the propriety of the trial court's ruling admitting such evidence in light of defendant's present theory. (*Id.,* subd. (b).) Under such circumstances, the claim is procedurally barred on appeal.

Reversal is not warranted in any event. Contrary to defendant's insinuation, Dr. Carpenter's testimony was by no means the only evidence that "effectively identified" defendant as the killer, and that eliminated robbery as the likely motive for the capital crime. For months, defendant expressed resentment toward Sonia and Doris over child custody and support issues. He wished Sonia were dead, and he wanted a restraining order against Doris. Defendant was the last person seen alive with the victims, and he was discovered immediately after the murders at the crime scene covered in their

blood, with cuts on his hands. His behavior and statements were suspicious. Evidence such as Lee's actions before and after the crime pointed to her cooperation with defendant in a plan to lure the victims to their deaths and to make the crime look like a robbery. Any error in the admission of Dr. Carpenter's testimony about the nonrobbery nature of most knife killings could not have harmed defendant under any applicable standard of prejudice.

### D. *Provocation and Lesser Included Offense Instructions*

The trial court instructed on two theories of first degree murder: murder by means of lying in wait, and willful, deliberate, and premeditated murder. (CALJIC Nos. 8.10, 8.11, 8.20, 8.25.) The court also instructed on unpremeditated second degree murder (CALJIC No. 8.30), and informed the jury of its duty to fix the degree of murder (CALJIC No. 8.70), and to give defendant the benefit of any reasonable doubt on that issue. (CALJIC No. 8.71.) However, the court denied defendant's request for instructions on the lesser included offense of voluntary manslaughter, including an instruction explaining that provocation in the form of a sudden quarrel or heat of passion may reduce murder to manslaughter.[21] The court denied a related request for CALJIC No. 8.73, that evidence of provocation could be considered in determining the degree of murder.[22]

On appeal, defendant repeats his claim that the requested instructions were warranted because the jury could conclude that the killings, even if intentional, occurred in a rage, such that defendant was not guilty of first degree murder and was guilty, at most, only of a lesser offense (i.e., voluntary manslaughter or unpremeditated second degree murder). The evidence cited in support of this argument comes from prosecution witnesses, and includes (1) expert testimony describing the victims' injuries as consistent with a crime of passion, (2) the victims' alleged hostility and conspiracy to separate defendant from his son Michael in the months and weeks before the killing, and (3) the asserted lack of any plan by defendant to kill the victims. Defendant contends the instructional error violated his right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution.

---

[21] The specific manslaughter instructions the court rejected were CALJIC Nos. 8.37 (manslaughter), 8.40 (voluntary manslaughter), 8.42 (sudden quarrel or heat of passion), 8.50 (murder distinguished from manslaughter), 8.72 (doubt as to murder versus manslaughter), 8.74 (unanimity on murder versus manslaughter), 8.75 (verdict forms for murder and manslaughter), and 17.49 (use of multiple verdict forms).

[22] CALJIC No. 8.73 states that if provocation played a role in an unlawful homicide, but was insufficient to reduce the offense to manslaughter, the jury should "consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation."

 Where an intentional and unlawful killing occurs "upon a sudden quarrel or heat of passion" (§ 192, subd. (a)), the malice aforethought required for murder is negated, and the offense is reduced to voluntary manslaughter—a lesser included offense of murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 153–154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) Such heat of passion exists only where "the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " (*Id.* at p. 163.) To satisfy this test, the victim must taunt the defendant or otherwise initiate the provocation. (*People v. Spurlin* (1984) 156 Cal.App.3d 119, 125–126 [202 Cal.Rptr. 663]; e.g., *People v. Berry* (1976) 18 Cal.3d 509, 512–515 [134 Cal.Rptr. 415, 556 P.2d 777] [young wife repeatedly subjected older husband to sexual insults, rejection, and admissions of infidelity, causing him to strangle her in jealous rage]; cf. *People v. Manriquez* (2005) 37 Cal.4th 547, 585–586 [36 Cal.Rptr.3d 340, 123 P.3d 614] [provocation lacking where defendant calmly shot bar patron who insulted and goaded him into firing]; see also *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [124 Cal.Rptr.2d 373, 52 P.3d 572] [revenge does not reduce murder to manslaughter].)

In a related vein, the " 'existence of provocation which is not "adequate" to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation' "—an inquiry relevant to determining whether the offense is premeditated murder in the first degree, or unpremeditated murder in the second degree. (*People v. Wickersham* (1982) 32 Cal.3d 307, 329 [185 Cal.Rptr. 436, 650 P.2d 311], quoting *People v. Valentine* (1946) 28 Cal.2d 121, 132 [169 P.2d 1].) First degree willful, deliberate, and premeditated murder involves a cold, calculated judgment, including one arrived at quickly (*Koontz, supra,* 27 Cal.4th 1041, 1080), and is evidenced by planning activity, a motive to kill, or an exacting manner of death. (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942].) Such state of mind "is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct." (*People v. Wharton* (1991) 53 Cal.3d 522, 572 [280 Cal.Rptr. 631, 809 P.2d 290].)

We see no substantial evidence that the killings were provoked and that defendant was guilty only of the lesser offenses on which instruction was sought. No conspiracy by the victims against defendant appears on this record. In December 1994, after defendant and Sonia ended their relationship and stopped living together, Sonia obtained child custody and support orders—something she was legally entitled to do. She also took the laudable step of maintaining a relationship with defendant's mother, Doris—the

grandmother of their son, Michael. Thus, over Easter weekend in April 1995, Sonia helped Doris recuperate after a brief hospital stay. Then, on May 5, 1995, about two weeks before the capital crime, Sonia stayed in Doris's apartment for one week. While there was some evidence that Sonia and Doris might thereafter relocate with Michael in another city, it is not clear defendant knew of this possibility. In any event, none of these events were sufficient "to arouse feelings of homicidal rage or passion in an ordinarily reasonable person." (*People v. Pride* (1992) 3 Cal.4th 195, 250 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

Far from being "the source" of any rage or passion (*People v. Spurlin, supra*, 156 Cal.App.3d 119, 126), Sonia was arguably taunted *by defendant*. In late 1994, he began dating codefendant Lee, a mutual colleague of theirs. Before long, coworkers and bosses learned of defendant's new relationship. On April 16, 1995, Easter Sunday, defendant invited Sonia on a drive and admitted that his relationship with Lee was sexual, causing Sonia to reflexively slap him. It appears Sonia did nothing to provoke sexual jealously in defendant.

Moreover, contrary to what defendant claims, all the available evidence suggests that, having desired Sonia's death for a considerable period of time, he actively planned the murders with codefendant Lee for at least one week. Prosecution witnesses testified defendant repeatedly said he wished Sonia was dead. The guilty look the pair displayed when spied by their managers at Universal on May 6, 1995, implied they were scouting the crime scene at the time. The planning process included defendant inviting the victims to a late-night Mother's Day meal before the murders—an invitation timed so that their guard would likely be down. He parked in the corner against the garage wall on the top floor with few cars nearby, creating what the prosecutor called a "killing zone." It appears codefendant Lee carefully timed her arrival on the scene, with defendant first calling her from the restaurant a few minutes beforehand. Through this arrangement, defendant had the benefit of a second person, Lee, in restraining and killing the victims, and in removing property from the scene in order to stage a robbery. Defendant also brought an extra knife that was found, unused, in the stairwell of the garage. Lee carried washcloths and Ziploc bags that could have been used to clean up and dispose of evidence—items that were found bloodstained in or near her car along Highway 170.

Finally, there was no evidence that "heated words were exchanged or a physical struggle took place between the victim[s] and the accused before the fatal[ ]" attack. (*People v. Wickersham, supra*, 32 Cal.3d 307, 329.) As noted, part of the lethal planning involved the victims' last meal. According to the waitress, the only testy behavior she saw during the Mother's Day dinner

came from defendant, not his two female guests. Indeed, defendant told the paramedic at the crime scene that he leaned into the car to kiss Sonia shortly before being attacked from behind by unknown assailants. He reported no quarrel with the victims.

 In sum, all the evidence indicated either that defendant was not the killer of Sonia and Doris (based on his robbery story at the crime scene) or that the killings were the product of his long-simmering resentment towards them over family issues, and that he exacted the ultimate revenge when he slashed them to death. There was no evidence sufficient to support either voluntary manslaughter instructions or unpremeditated second degree murder instructions based on heat of passion. The defense request for such instructions was thus properly denied.

## V. SPECIAL CIRCUMSTANCES ISSUES

### A. Sufficiency of Evidence of Financial Gain

In addition to sustaining special circumstances involving multiple murder and murder while lying in wait, the jury found that Sonia's murder "was intentional and carried out for financial gain." (§ 190.2, subd. (a)(1).) The prosecution's theory in this regard, as reflected in evidence and argument at trial, was that defendant killed Sonia to end the $375 monthly child support payments she received by garnishing his wages at the Bank. In various motions (e.g., regarding acquittal, instructions, and a new trial) defendant argued that the prosecution did not prove he expected or received any direct financial gain from Sonia's death. The trial court rejected all such challenges to the financial gain special circumstance.

Defendant argues here, as below, that he had nothing to gain from eliminating child support payments to Sonia because he was required to support his son Michael even after Sonia died. Under defendant's view, the prosecution could not sustain its burden of proof absent evidence that he anticipated an inheritance, insurance, or other direct pecuniary gain from Sonia's death. Violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the federal Constitution have allegedly occurred. We disagree.

 Section 190.2, subdivision (a)(1) applies to murders motivated by financial gain. (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1178 [259 Cal.Rptr. 701, 774 P.2d 730], applying *People v. Howard* (1988) 44 Cal.3d 375, 409–410 [243 Cal.Rptr. 842, 749 P.2d 279], and *People v. Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994].) However, such gain need not be the sole or main motive for the murder. (*People v. Sapp* (2003) 31 Cal.4th 240, 282 [2 Cal.Rptr.3d 554, 73 P.3d 433], following *People v.*

*Noguera* (1992) 4 Cal.4th 599, 635 [15 Cal.Rptr.2d 400, 842 P.2d 1160] (*Noguera*).) Nor must defendant experience any actual pecuniary benefit from the victim's death. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1025 [254 Cal.Rptr. 586, 766 P.2d 1] (*Edelbacher*).) " '[T]he relevant inquiry is whether the defendant committed the murder in the expectation that he would thereby obtain the desired financial gain.' " (*Ibid.*, quoting *People v. Howard, supra*, 44 Cal.3d at p. 409.)

In *Edelbacher, supra*, 47 Cal.3d 983, the defendant killed his estranged wife, with whom he had a child, in order to avoid making child support payments. Such payments were in arrears and were the subject of a wage garnishment order entered shortly before her death. The defendant, who struggled to pay other bills as well, also owed his wife a substantial amount to equalize the community property division in their pending marital dissolution action. *Edelbacher* first rejected the defendant's claim that the financial gain special circumstance was overbroad and unconstitutional as applied there. To the contrary, this court reasoned that it would be arbitrary and irrational to conclude that "cancellation of a debt or the avoidance of a loss" does not constitute a financial benefit, since such motivation is no less repugnant than killing someone for direct "profit." (*Id.* at p. 1025.) *Edelbacher* further found the evidence sufficient to show a financial motive for murder. We emphasized the benefit the defendant expected to receive either by the extinguishment of debts upon his wife's death, or by gaining custody of his son and acquiring control of the son's inheritance from the estate. (*Id.* at p. 1026.)

Likewise, the jury could readily infer beyond a reasonable doubt that defendant killed Sonia because he believed her death would ease his financial strain. The evidence showed that the $375 monthly child support obligation substantially reduced his net pay, that his modest income from the Bank was his main asset, that his liabilities overshadowed his assets, and that he had difficulty paying his monthly bills such that he worried about declaring bankruptcy. More to the point, defendant perceived his child support obligation to Sonia as a tremendous burden, calling her a "bitch" and "whore" who deserved to die, and saying that his financial future would be "fucked" if nothing changed. The jury could conclude that defendant sought to benefit financially from Sonia's death by gaining control of the money which, by court order, he was paying her for Michael's support, and by having the ability to decide that less money should be spent in that regard. The prosecution made a similar point in closing argument.

We reject defendant's related claim that the financial gain special circumstance is unconstitutionally vague and overbroad under federal law. As noted above, a similar contention failed in *Edelbacher, supra*, 47 Cal.3d 983.

Nothing in our interpretation of the statute there, or its application here, extends death eligibility to *every* homicide involving a family member to whom the killer owed a duty of support. The special circumstance is limited to those murders, including those intrafamilial murders, committed with the expectation that they would produce the desired financial benefit. (*Id.* at p. 1025.) No overbreadth or vagueness problem appears. (Accord, *Noguera, supra,* 4 Cal.4th 599, 636.)

## B. *Validity of Lying-in-wait Special Circumstance*

The prosecution alleged, and the jury found, that defendant "intentionally killed" both victims "while lying in wait." (§ 190.2, former subd. (a)(15), added by Prop. 7, § 6, approved by voters, Gen. Elec. (Nov. 7, 1978); see now § 190.2, subd. (a)(15), as amended by Prop. 18, approved by voters, Primary Elec. (Mar. 7, 2000) eff. Mar. 8, 2000 [changing "while" lying in wait to "by means of" lying in wait].) On appeal, defendant claims the special circumstance applicable to his crime fails to adequately narrow the class of death-eligible murders because it applies "to virtually all homicides." He suggests the trial court erred in rejecting a similar claim he raised several times at trial (e.g., in moving for acquittal, discussing proposed instructions, and seeking a new trial). A due process violation under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution is asserted here.

■ However, as we have explained many times before, the version of the lying-in-wait special circumstance at issue here is not unconstitutionally overbroad on the ground urged by defendant. It is limited to intentional murders that involve a concealment of purpose and a meaningful period of watching and waiting for an opportune time to attack, followed by a surprise lethal attack on an unsuspecting victim from a position of advantage. (*People v. Morales* (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64, 770 P.2d 244].) Such is the case where, as here, the defendant ambushes the victim after luring him or her to a secluded spot on a pretext. (E.g., *Bonilla, supra,* 41 Cal.4th 313, 331–332 & fn. 6; *People v. Webster* (1991) 54 Cal.3d 411, 448–449 [285 Cal.Rptr. 31, 814 P.2d 1273].) We therefore conclude no constitutional violation or other error occurred.

## VI. PENALTY ISSUES

## A. *Effect of Joinder on Sentencing*

Near the start of the guilt phase defendant moved for a mistrial and, alternatively, for severance based on a newspaper article published the same day concerning a Texas capital case. The article suggested that female

murderers were less likely to be executed for capital crimes than their male counterparts. Defendant, who presented no evidence that any juror read the article, insisted that a joint penalty trial would unduly prejudice him because the jury was likely to show "deference" to codefendant Lee simply because she was a woman. The trial court denied the motion. It noted that the motion could be renewed later in the event defendants were convicted and faced a joint penalty trial—an option defendant never exercised.

On appeal, defendant claims that a joint penalty trial is "inherently skewed" against male defendants and in favor of female codefendants due to "misplaced chivalry" by lay jurors. The court's failure to grant severance on this ground allegedly violated various federal and state constitutional rights. Defendant emphasizes Eighth Amendment requirements favoring individualized sentencing determinations (see *Lockett v. Ohio* (1978) 438 U.S. 586, 605 [57 L.Ed.2d 973, 98 S.Ct. 2954] (plur. opn. of Burger, C. J.) (*Lockett*)), and due process prohibitions against joint trials that are grossly unfair. (See *Lewis and Oliver, supra*, 39 Cal.4th 970, 998.)

No error occurred. Defendant offers only generalized assumptions about cultural stereotypes and gender biases in criminal cases. Nothing suggests the jury failed to properly perform its sentencing function in reaching different outcomes for defendant (a death verdict) and Lee (a hung jury leading to LWOP). Indeed, there were bases in the evidence for this disparity. Defendant was the leader in the killings, and codefendant Lee was the determined follower. The prosecutor noted that they were "equally responsible" for the slayings, but that the penalty determination was "separate" as to each defendant.

Moreover, in advising the jury how to weigh and consider the factors in aggravation and mitigation, the instructions stated, among other things, that the penalty determination as to each defendant must be "based solely on the evidence applicable to that defendant, uninfluenced by what penalty has been or may be determined as justified and appropriate as to the other defendant." (CALJIC No. 8.84.) Jurors were also told that penalty must be "decide[d] separately" as to each defendant. (CALJIC No. 17.00.)

In light of the foregoing, the jury was adequately apprised of the individualized nature of the sentencing determination. No evidence of gender bias or improper comparisons between defendants appears. The claim of error fails.

B. "Skipper/Lockett" *Error*

At the penalty phase, defendant sought to introduce the testimony of Barbara Schochet, a psychotherapist Sonia visited several times in the weeks

before the capital crime. Counsel argued that Sonia's statements to Dr. Schochet during therapy would "blunt" prosecution evidence that portrayed Sonia and her family in an unblemished light, and that suggested Sonia and her family were close. Counsel also argued that Sonia's distrust and insecurity toward her own family, and her belief that she could easily manipulate defendant, caused her to act in ways that "pushed him over the edge" and showed he was not "the main actor" in the crime.[23]

The prosecutor objected on grounds the evidence violated the psychotherapist-patient privilege, the hearsay rule, and relevance requirements. The trial court granted the prosecutor's request for a hearing on the admissibility of the proffered testimony.

At the hearing, Dr. Schochet took the stand and read out loud from 10 pages of handwritten notes that she made during Sonia's therapy sessions. Sonia reportedly made the following statements therein: As to her relationship with defendant, Sonia worried that she would lose her son to defendant, she viewed her relationship with defendant as volatile, and she found him to be unavailable when she needed him. As to her relationship with her own parents, Sonia feared becoming as dependent on defendant as her mother had become with respect to her father. Sonia recalled the trauma her mother experienced when her father left the marriage after 25 years and fathered a child with someone else. As to defendant's personality, Sonia described him as sweet and nice, and "easily influenced" to the point that she could "tell him what to do." According to Sonia, defendant was not as smart as she was, and she preferred someone who could take more control. However, she also believed he was vindictive, short-tempered, and anger-prone.

As pertinent here, the trial court sustained the prosecutor's relevance objection and excluded Dr. Schochet's testimony. The court reasoned that the feelings Sonia expressed to Dr. Schochet were irrelevant absent evidence that she communicated them somehow to defendant, and that his conduct was affected as a result. Otherwise, the court said, any mitigating inferences were speculative.

On appeal, defendant claims the trial court erred in not finding Dr. Schochet's testimony relevant and admissible on the theories he presented

---

[23] Defense counsel did not link Dr. Schochet's proffered testimony to any specific statutory sentencing factor. Counsel suggested, however, that Sonia's statements during therapy were offered to mitigate penalty under various theories, such as to counter prosecution evidence concerning the circumstances of the capital crime, including victim impact testimony (see § 190.3, factor (a)), to show defendant acted under extreme duress or under the substantial domination of another (see *id.*, factor (g)), to show he was a mere accomplice whose participation in the capital crime was relatively minor (see *id.*, factor (j)), and to minimize his culpability and otherwise extenuate the gravity of the capital crime (see *id.*, factor (k)).

below. In his view, the jury could reasonably infer from Sonia's description of her own state of mind that she had started to detach from both defendant and her own family after giving birth to Michael, that she had turned to defendant's mother, Doris, for support in raising Michael, that she and Doris had colluded to alienate defendant from Michael, and that such actions sent defendant into a rage that caused him to kill both women. By preventing the jury from taking these inferences into account, the trial court's ruling allegedly violated defendant's right to present relevant mitigating evidence, and to due process and a fair penalty trial, under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

■ As noted by defendant, the federal Constitution requires that the sentencer in a capital case not be precluded from considering relevant mitigating evidence. (*Skipper v. South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 106 S.Ct. 1669]; *Eddings v. Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 102 S.Ct. 869]; *Lockett, supra*, 438 U.S. 586, 604 (plur. opn. of Burger, C. J.).) Such evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (*Lockett, supra*, at p. 604; accord, *People v. Easley* (1983) 34 Cal.3d 858, 877–878 & fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) However, while the range of constitutionally pertinent mitigation is quite broad (*People v. Whitt* (1990) 51 Cal.3d 620, 647 [274 Cal.Rptr. 252, 798 P.2d 849]), it is not unlimited. Both the United States Supreme Court and this court have made clear that the trial court retains the authority to exclude, as irrelevant, evidence that has no logical bearing on the defendant's character, prior record, or the circumstances of the capital offense. (*Lockett, supra*, 438 U.S. at p. 604, fn. 12; *Coffman and Marlow, supra*, 34 Cal.4th 1, 115–116; *People v. Frye* (1998) 18 Cal.4th 894, 1015 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

Here, the trial court properly determined "in the first instance" that the proffered mitigation was irrelevant. (*People v. Frye, supra*, 18 Cal.4th 894, 1015.) Defendant sought to prove that Sonia's insecurities and distrust of her own family caused her to *act* in ways that estranged her from them and from defendant, and that drove her to form a close bond with Doris. Defendant also sought to prove that Sonia's view of defendant as someone she could "easily influence[ ]" caused her to *act* in ways that provoked him into killing both her and Doris. However, Sonia's personal thoughts and feelings, as expressed during psychotherapy, are not the same as actions. Defendant's contrary assumption defies common sense. Thus, the court properly determined that Sonia's state of mind had no tendency in reason to prove the occurrence of a chain of events triggering a lethal response on defendant's part—events necessary to raise the mitigating inferences he has argued here and below. (See Evid. Code, §§ 210, 351.) We find no constitutional violation or evidentiary error in the exclusion of Dr. Schochet's testimony.

## C. *Lingering Doubt Evidence*

Defendant contends the trial court violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution in not allowing consideration of any doubts that may have "lingered" in the minds of jurors who were not certain of his guilt beyond all doubt. (See *People v. Zapien* (1993) 4 Cal.4th 929, 989 [17 Cal.Rptr.2d 122, 846 P.2d 704].) As we shall explain, this claim focuses on two categories of evidence that, as he did below, defendant insists showed Sonia's "manipulation" and "provocation" of defendant: (1) Dr. Schochet's testimony describing Sonia's statements about defendant, their relationship, and her own family during therapy, and (2) a pair of letters Sonia wrote to defendant in November and December 1994, in which she expressed her love for him and her interest in resuming an intimate relationship.

The trial court did not mishandle this evidence for various reasons unrelated to the concept of lingering doubt. First, as noted above, Sonia's statements to Dr. Schochet expressing feelings about defendant and other family members did not establish "manipulati[ve]" or "provocati[ve]" acts on the part of Sonia or defendant, as he claims. The court thus properly excluded this evidence as having no bearing on any mitigating inference defendant sought to raise.

Second, defendant erroneously implies in his opening brief on appeal that the trial court *excluded* Sonia's letters to defendant. However, after noting that they were received and presumably read by defendant and were found in his possession, the trial court *admitted* the letters into evidence. The court reasoned that counsel, to the extent he deemed the letters "relevant to the issues before the jury," could "make an argument as to how [such evidence] may have affected [defendant]." No constitutional violation or other error on lingering doubt occurred.

## D. *Prosecutor's Closing Argument*

Defendant argues that the prosecutor committed misconduct in closing argument at the penalty phase, that the trial court exacerbated the issue to some extent, and that his rights under the Fifth, Eighth, and Fourteenth Amendments of the federal Constitution were thereby violated. We disagree.

Defendant's main complaint concerns the prosecutor's statements that "the minimum penalty" is not adequate for some killers, and that, on behalf of the "millions of people in the State of California who enacted the death penalty," defendant deserved the "maximum" penalty for the capital crime. Defendant (along with codefendant Lee) objected to these remarks. The trial court

responded by telling the jury to disregard public opinion in sentencing defendant, that the applicable law allowed the jury to choose between LWOP and death, and that the choice was each juror's alone to make. A short time later, during defendant's closing argument, the court barred counsel from discussing the penalties associated with any form of criminal homicide (e.g., manslaughter) other than first degree murder.

Contrary to what defendant claims, the prosecutor did not mischaracterize LWOP as a "slap on the wrist," and the court did not err in denying rebuttal argument on the "range of penalties for criminal homicide." The prosecutor's remarks concerning "minimum" and "maximum" penalties properly implied that LWOP and death were the only two penalties available in defendant's case. (See, e.g., *Prince, supra*, 40 Cal.4th 1179, 1295 [LWOP is the minimum punishment]; *People v. Memro* (1995) 11 Cal.4th 786, 879 [47 Cal.Rptr.2d 219, 905 P.2d 1305] [death is worse than LWOP]; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1230, fn. 27 [275 Cal.Rptr. 729, 800 P.2d 1159] [defendant deserves the maximum penalty].) There was no misconduct in this regard, and nothing for defendant to rebut.

Regarding the prosecutor's related reference to the electorate, any impropriety was cured by the court's admonition to disregard the comment and to follow the sentencing instructions. Jurors could not have been misled into imposing death for abstract political reasons unrelated to the evidence in defendant's case. (Compare *People v. Rowland* (1992) 4 Cal.4th 238, 276 [14 Cal.Rptr.2d 377, 841 P.2d 897] [questioning references to voters on death penalty matters] with *People v. Jones* (1998) 17 Cal.4th 279, 309 [70 Cal.Rptr.2d 793, 949 P.2d 890] [allowing references to jury's civic duty to return a verdict based on the evidence].)

The last instance of alleged misconduct occurred when the prosecutor called defendant the "worst of the worst" with respect to death-eligible murderers. Defendant insists this comment urged imposition of the death penalty for reasons extraneous to his case.

The claim is forfeited for failure to object below. (See *Stitely, supra*, 35 Cal.4th 514, 572.) It also lacks merit. Our prior cases suggest it is not uncommon for defense counsel to argue that his client is *not* the "worst of the worst" in terms of death eligibility, and that death is not warranted. (See, e.g., *People v. Benavides* (2005) 35 Cal.4th 69, 110 [24 Cal.Rptr.3d 507, 105 P.3d 1099]; *People v. Hughes* (2002) 27 Cal.4th 287, 400 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Sakarias* (2000) 22 Cal.4th 596, 638 [94 Cal.Rptr.2d 17, 995 P.2d 152].) Here, the prosecutor told jurors that he expected such an argument from the defense. There was nothing improper about this approach. (E.g., *People v. Ochoa* (2001) 26 Cal.4th 398, 450–452 [110 Cal.Rptr.2d 324,

28 P.3d 78] [prosecutor may address counsel's suggestion that defendant is not in the group deserving death (i.e., the worst of the worst) by noting that he is not in the group deserving life (i.e., the best of the worst)].) Indeed, the prosecutor linked his argument to the premeditated, painful, and personal nature of the murders. We will not reverse the judgment on misconduct grounds.

### E. *Effect of Ex Parte In Camera Meetings on Modification Motion*

Defendant registers a second complaint on appeal about the 10 ex parte in camera proceedings that occurred between the trial court and codefendant Lee's counsel, insisting they impaired his federal and state constitutional rights at sentencing (i.e., to due process and to freedom from cruel and unusual punishment). He assumes that Lee's counsel, Hall, presented adverse extraneous information about defendant during these proceedings, that such information tainted the court's view of the evidence in aggravation and mitigation, and that the court erroneously denied his automatic motion to modify the penalty verdict under section 190.4, subdivision (e) (section 190.4(e)) as a result. The primary concern seems to be that the court ignored mitigating evidence and overemphasized aggravating evidence.

As a preliminary matter, we agree with the Attorney General that defendant has forfeited his challenge to the section 190.4(e) ruling by failing to object below. Defendant cannot object for the first time on appeal where, as here, the hearing, which occurred in 1998, postdated the finality of *People v. Hill* (1992) 3 Cal.4th 959, 1013 [13 Cal.Rptr.2d 475, 839 P.2d 984]. (*Lewis and Oliver, supra,* 39 Cal.4th 970, 1064.)

On the merits, the record of the section 190.4(e) hearing belies any claim of error. In ruling on the motion, the trial court applied the correct legal standard. It referred more than once to its duty to make an independent determination concerning the propriety of the death penalty, and to independently reweigh the evidence in aggravation and mitigation and determine whether, in the court's own judgment, the weight of the evidence supports the jury verdict. (*People v. Burgener* (2003) 29 Cal.4th 833, 891 [129 Cal.Rptr.2d 747, 62 P.3d 1].)

In reviewing the evidence in mitigation, the trial court acknowledged that, until the time of the capital crime, defendant had lived a law-abiding life, and had done "some good things." The court also observed that the outcome at sentencing might have been different had the murders actually occurred during a "lengthy and vituperative [family] argument" in which defendant suddenly grabbed a knife and killed Sonia and Doris in a blinding rage. However, the court made clear in independently assessing the evidence, that

the death verdict was amply supported by the planned and premeditated nature of the murders, and the cruel and brutal manner in which they were committed.

Along these lines, the court said, "the premeditation in this case was exceptional. It was calculated. It was not in any sense emotionally compelled." Also critical in the court's view was that defendant destroyed his own family. The court emphasized that "[h]e's deprived [his son] Michael of his mother and he's deprived Michael of his father, namely, Mr. Carasi himself. He made this child an orphan. And in his presence."

As to the 10 closed proceedings to which defendant now objects, we note that no discussion about the appropriate penalty for either defendant appears in the relevant transcripts, most of which are still sealed. The trial court also made no mention during the section 190.4(e) hearing of such proceedings or of its interactions with Lee's counsel at any point in time. Nor did the court deny the modification motion based on aggravating evidence not admitted at trial. Thus, our review of the record leads us to conclude that the court carefully and properly performed its duty in denying the motion to modify the death verdict under section 190.4(e). We reject defendant's contrary claim.

## F. *Validity of Death Penalty Law*

Defendant contends the death penalty law under which he was sentenced denied him due process and a fair penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and under parallel provisions of the state Constitution. We have previously rejected similar claims and do so again here. Thus, the homicide and death penalty statutes adequately narrow the class of first degree murderers eligible for the death penalty. The scheme is not overbroad because of the sheer number, nature, and scope of the special circumstances, including the lying-in-wait and financial-gain special circumstances applied here. (*Stitely, supra,* 35 Cal.4th 514, 573, and cases cited therein.) Nor did the trial court err in failing to instruct that the standard of proof for finding aggravating factors must be beyond a reasonable doubt, or that the jury must unanimously agree on this issue. High court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], have not changed our conclusions in this regard. (*Boyer, supra,* 38 Cal.4th 412, 485, and cases cited therein.)

### VII. CONCLUSION

The judgment is affirmed in its entirety.

George, C. J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I join the majority in affirming defendant's two murder convictions and the special circumstances of multiple murder, murder for financial gain, and lying in wait. For the reasons given in Justice Werdegar's concurring and dissenting opinion, however, I would reverse the judgment of death, based on the trial court's refusal to ask prospective jurors whether the circumstances that defendant killed his mother and the mother of his child would cause them *automatically* to vote for death, without consideration of the mitigating circumstances presented at the penalty phase.

I write separately to explain my views on another issue: Whether defendant made a prima facie showing that the prosecution's peremptory challenges against prospective women jurors were motivated by group bias. On this issue, as explained below, I disagree with the majority's reasoning underlying its conclusion (with which I agree) that defendant failed to make a prima facie case.

## I

During jury selection, the prosecutor exercised 23 peremptory challenges, 20 of them against women. At the end of voir dire, counsel for codefendant Donna Lee moved to strike the jury panel on the ground that the prosecutor had impermissibly exercised sex-based peremptory challenges. Defendant joined in codefendant Lee's motion.

The trial court, commenting that the percentage of the prosecution's challenges against women was "eyebrow-raising, to say the least," took the motion under submission to determine whether the defense had made a prima facie showing that the challenges were motivated by group bias. More than a month later, long after the evidentiary portion of the trial had started, the court denied the motion without asking the prosecution to give its reasons for the challenges, explaining that it had considered "the background of the jurors who were excused," the gender of the persons selected to serve as jurors, and the circumstance that the majority of the panel consisted of women.

## II

Peremptory challenges against prospective jurors may not be based on impermissible group bias, such as race or sex. (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *J. E. B. v. Alabama ex rel. T. B.* (1994) 511 U.S. 127, 129 [128 L.Ed.2d 89, 114 S.Ct. 1419]; *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).) The party objecting to the challenges must establish a prima facie case of group bias

" 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' " (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410].) The challenger must then offer a justification for the strikes, after which the trial court must decide whether the party objecting to the peremptory challenges has shown that they were motivated by group bias. (*Ibid.*)

Ordinarily, this court reviews for substantial evidence a trial court's determination that the defendant failed to make the requisite prima facie showing of impermissible group bias. (*People v. Bonilla* (2007) 41 Cal.4th 313, 341 [60 Cal.Rptr.3d 209, 160 P.3d 84]; *People v. Jones* (1998) 17 Cal.4th 279, 293 [70 Cal.Rptr.2d 793, 949 P.2d 890].) But here, as the majority explains, we must "independently determine whether the record permits an inference that the prosecutor excused jurors on prohibited discriminatory grounds." (Maj. opn., *ante*, at p. 1293; see also *People v. Kelly* (2007) 42 Cal.4th 763, 779 [68 Cal.Rptr.3d 531, 171 P.3d 548].)

In *Wheeler*, this court gave examples of evidence relevant to establish a prima facie showing of bias: "[T]he party may show that his opponent has struck most or all of the members of the identified group from the venire, or has *used a disproportionate number of his peremptories against the group.* He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire . . . . Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention." (*Wheeler, supra*, 22 Cal.3d at pp. 280–281, italics added, fn. omitted; see also *People v. Kelly, supra*, 42 Cal.4th at pp. 779–780.)

Here, the prosecution exercised a disproportionate number of its peremptory challenges—20 out of 23 challenges, or 87 percent—against women. Also belonging to that group was codefendant Lee, against whom the prosecutor was seeking the death penalty. Because the evidence of guilt as to both defendant and codefendant Lee was overwhelming, the primary issue at trial was likely to be that of penalty, and the prosecutor may have feared that women would, out of sympathy for Lee, not vote for death.[1]

---

[1] Indeed, the jury convicted both defendants as charged, but it was unable to reach a verdict on penalty as to codefendant Lee.

These facts, according to the majority, do not give rise to an inference of discriminatory purpose. (*Johnson v. California, supra*, 545 U.S. 162, 168.) The majority explains: "[A]fter initially accepting the panel without exercising any peremptory challenges at all, the prosecutor accepted the panel *eight additional times* with seeming disregard for the number of females or the ratio of female to male jurors. On two such occasions, the prosecution was willing to have defendant tried by a jury of eight women and four men. Two other times, there were six men and six women in the jury box—another split suggesting men were not being favored over women. The prosecution chose, on two more occasions, to peremptorily excuse a man when the panel consisted of seven or more women." (Maj. opn., *ante*, at p. 1294.) This "pattern of excusals and acceptances" (*ibid.*), the majority concludes, demonstrates that the prosecutor's peremptory challenges were not sex-based.

The majority's reasoning is unpersuasive in light of the tactical realities of jury selection in a multidefendant capital case. True, the prosecutor here twice accepted jury panels that included eight women. But this occurred very early in the jury selection process, when defendant and codefendant Lee had many peremptory challenges remaining and it was highly unlikely that both would accept the jury panel as then constituted. Understanding this, an experienced prosecutor might well perceive a tactical advantage in declining to exercise a peremptory challenge at that stage. By conserving peremptory challenges early in the jury selection process, the prosecutor could expect to have more remaining challenges than the defense as jury selection neared its conclusion. In particular, a prosecutor wanting to reduce the number of women on the final jury panel might well accept a panel containing a high ratio of women to men early in the selection process, with the expectation that peremptory challenges could more effectively be used to reduce this ratio later, after the two defendants had exhausted their peremptory challenges.

The majority points out that the prosecutor several times accepted jury panels of six men and six women. (Maj. opn., *ante*, at p. 1294.) True. But in a case where a majority of the prospective jurors under consideration were women, a prosecutor biased against women could reasonably have regarded such a panel as acceptable. Nor is it significant that here the prosecutor excused two men when the panel contained a majority of women. A prosecutor biased against women would not necessarily permit that bias to prevail over all other considerations and might well exercise some peremptory challenges against men whose questionnaire answers and voir dire responses suggested that they would be highly unsympathetic to the prosecution in the particular case.

The above-mentioned "pattern of excusals and acceptances" (maj. opn., *ante*, at p. 1294) is the sole basis for the majority's rejection of defendant's

claim of impermissible group bias underlying the prosecution's exercise of 20 out of 23 peremptory challenges against women. Had that pattern been the only evidence on this issue, I would have concluded that defendant had established a prima facie case of impermissible group bias. But there is other evidence, not at all discussed by the majority, that strongly indicates sex-neutral reasons for the prosecutor's challenges.

To determine whether a defendant has made the requisite prima facie showing, this court often examines the background of the jurors who were excused, as revealed by their answers to the juror questionnaires and during voir dire, to see whether those answers suggest a reason for the prosecutor's peremptory challenges. (See, e.g., *People v. Bonilla, supra,* 41 Cal.4th at pp. 346–349.) After a careful and thorough examination of answers given in the jury questionnaires and at voir dire, I conclude there were obvious sex-neutral reasons for the challenges.

The answers of 12 of the 20 women who were excused by the prosecutor show a strong reluctance to impose the death penalty. Defendant concedes that seven of the women challenged (Prospective Jurors Mariannel B.-D., Rose W., Joyce C., Bianca G., Abigail H., Deanna M., and Lois S.) "did express some aversion to [the] death penalty in principle or in practice." Similar views were expressed in the answers of five other prospective jurors (Jeanette A., Janet H., Carol R., Linda R., and Rosemarie K.). Defendant, however, insists that these five women were not opposed to the death penalty because each had checked off a box on the jury questionnaire indicating a desire to keep the current death penalty law "as it is." But, as explained below, other questionnaire answers by these five women indicated that even if they were not opposed to the death penalty in the abstract, they would personally be reluctant to vote for it.

Question 52 on the jury questionnaire asked: "Given the fact that you have two options available to you, can you see yourself, in an appropriate case, choosing the death penalty?" Prospective Juror Jeanette A. answered "no." Question 51 asked whether, in an appropriate case, life imprisonment without the possibility of parole, rather than death, would be an option. Her answer was "yes." As to Prospective Juror Janet H., she wrote "I don't know!" in answer to question 52, and "yes" to question 51. These answers strongly suggest that both women would be reluctant to vote for death.

Prospective Juror Carol S. wrote on her questionnaire, "I'd be loath to vote for the death penalty," explaining, "I believe that violence leads to more violence, killing to more killing." She held "very strong" feelings on the

death penalty. Although elsewhere in her questionnaire she voiced a willingness to vote for death "if the circumstances called for it," it is likely that the prosecutor viewed these answers as indicative of a strong reluctance to vote for death.

Prospective Juror Linda R. wrote on the questionnaire: "I don't particularly like the death penalty, but I understand that in certain circumstances it is appropriate." Explaining her dislike for the death penalty, she wrote: "No human has the right to decide life or death as does God." Based on these comments, the prosecutor could reasonably conclude that Linda R. would have a problem voting for death.

Prospective Juror Rosemarie K.'s answers to the questionnaire suggest that she had previously been opposed to the death penalty, but that she now believed it was appropriate if the offense was "horrendous," such as the brutal murder of a child. The prosecutor could have reasonably concluded from this answer that for this prospective juror, this case would not be sufficiently "horrendous" to justify the death penalty because the victims were adults.

Thus, with respect to the 12 prospective jurors discussed above, their expressed reluctance to impose the death penalty provides a proper and sex-neutral basis for the prosecutor's peremptory challenges.

Five other women challenged by the prosecutor had extensive professional or personal involvement in counseling or psychology. Sally M.-P. was a licensed clinical social worker (LCSW) who had a masters degree in social work and was considering pursuit of a Ph.D. in psychology; she had been a therapist for seven years. Gloria B., too, was an LCSW with a master's degree in social work; she supervised a sexual trauma team that included psychologists, social workers, and a psychiatrist. Carolyn S. had a master's degree in "counseling psychology" and had been a vocational rehabilitation counselor. Angela G. had recently graduated from college with a degree in psychobiology and planned to attend medical school. And Linda D. had a bachelor's degree in psychology and was living with a biofeedback therapist who had an "MFC license" and had worked as a counselor.

Psychiatric testimony usually plays a major role for the defense at the penalty phase of a capital case. Here, codefendant Lee relied on such testimony at both the guilt and the penalty phase of this case. In excusing prospective jurors with a strong background in counseling or psychology, the prosecutor may well have been concerned that they would give greater credence to such testimony.

Two other women excused by the prosecutor were closely associated with persons likely to be unsympathetic to the prosecution. Prospective Juror

Rose P. was a former member of the American Civil Liberties Union and had twice married men who had served prison sentences, one for murder; she herself had twice been arrested (though not convicted). Juror Erma R.'s son was a criminal defense attorney previously employed by the Los Angeles County Public Defender's Office, which represented defendant in this case.

The above discussion accounts for 19 out of the 20 women challenged by the prosecutor. The prosecutor's reasons for excusing the 20th woman are not clear from the record. Nevertheless, the presence of sex-neutral reasons for 19 of the 20 peremptory challenges against women suggests that the challenges were based on reasons other than the sex of the prospective jurors. These reasons, rather than the "pattern of excusals and acceptances" relied on by the majority (maj. opn., *ante*, at p. 1294), forms the basis for my conclusion that the trial court properly denied defendant's *Batson-Wheeler* motion asserting impermissible bias against women as a group.

**WERDEGAR, J.,** Concurring and Dissenting.—Would knowledge that defendant's offenses involved the premeditated murder of his own mother and the mother of his child cause some otherwise impartial jurors to invariably vote for a sentence of death? I believe the answer is yes and that the trial court therefore erred in failing to question jurors about these facts of defendant's case. I therefore dissent from the affirmance of the penalty judgment.

Individuals accused of capital crimes enter a long journey through our judicial system in which the end result may be the loss of their life at the hand of the state. Because it is a constitutional imperative that "[n]o state shall . . . deprive any person of [his] life . . . without due process of law,"[1] the procedures governing capital trials are designed to ensure fundamental fairness to the accused. We address in this case the procedures applicable to a critical early phase of a capital trial: jury selection.

It is vitally important to the accused in particular and society in general that the jury selected for trial in a capital crime be fair and impartial,[2] and be composed of persons who would neither always vote for a life sentence nor always vote for death, but would weigh the applicable factors shown by the evidence and follow the law as instructed by the trial court. "We have long recognized that '[t]he right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the

---

[1] United States Constitution, Fourteenth Amendment; see also California Constitution, article I, section 7, subdivision (a) (same).

[2] See United States Constitution, Sixth Amendment ("the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* . . ." [italics added]); see also California Constitution, article I, section 16 ("Trial by jury is an inviolate right and shall be secured to all . . . .").

[C]onstitution.' (*Lombardi v. California St. Ry. Co.* (1899) 124 Cal. 311, 317 [57 P. 66].)" (*People v. Earp* (1999) 20 Cal.4th 826, 852 [85 Cal.Rptr.2d 857, 978 P.2d 15] (*Earp*).) "In a state such as California that in capital cases provides for a sentencing verdict by a jury, 'the due process clause of the Fourteenth Amendment of the federal Constitution requires the sentencing jury to be impartial to the same extent that the Sixth Amendment requires jury impartiality at the guilt phase of the trial.' [Citations.] California's Constitution provides an identical guarantee." (*Id.* at pp. 852–853.)

To ensure impartiality in this case, defendant sought to ask prospective jurors whether they could remain fair and impartial upon learning that he was accused of luring his own mother, and the mother of his young child, into a fatal ambush on Mother's Day. The majority declines to address the merits of defendant's claim, asserting he forfeited it by failing to raise it at trial. As explained below, the majority gives the record a parsimonious reading, but in any event, any failure on defendant's part to make a more specific objection would be excused on grounds of futility.

On the merits, the trial court's refusal to question prospective jurors about the matricidal and intrafamilial aspects of the case makes it impossible to determine whether any of the jurors held the disqualifying view that the death penalty "should be imposed invariably and automatically on any defendant" (*People v. Cash* (2002) 28 Cal.4th 703, 723 [122 Cal.Rptr.2d 545, 50 P.3d 332] (*Cash*)) who had killed both his own mother and the mother of his child. Accordingly, the penalty judgment must be reversed.

## I

The process by which a large pool of prospective jurors is winnowed down to ensure that the final 12 jurors (plus some alternates) satisfy the constitutional requirement of impartiality is called voir dire, meaning "To speak the truth." (Black's Law Dict. (5th ed. 1979) p. 1412, col. 2.) " 'Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.' " (*Earp, supra,* 20 Cal.4th at p. 852.)

Voir dire examination protects an accused's right to a fair trial " 'by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions . . . may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges.' [Citation.] 'The ability of a defendant, either personally, through

counsel, or by the court, to examine the prospective jurors during voir dire is thus significant in protecting the defendant's right to an impartial jury.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 689–690 [27 Cal.Rptr.3d 360, 110 P.3d 289] (*Roldan*).)

Although courts have broad discretion in deciding what questions to ask on voir dire (*People v. Cleveland* (2004) 32 Cal.4th 704, 737 [11 Cal.Rptr.3d 236, 86 P.3d 302]; *Mu'Min v. Virginia* (1991) 500 U.S. 415, 424 [114 L.Ed.2d 493, 111 S.Ct. 1899]), such discretion is not limitless. In capital cases, such questions should be directed at determining whether "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) Prospective jurors holding such disqualifying views may be excluded from a capital jury for cause whether the juror's views favor or disfavor the death penalty. (*Cash, supra,* 28 Cal.4th at p. 720; see *People v. Livaditis* (1992) 2 Cal.4th 759, 772–773 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

In appropriate cases, voir dire questioning, to be effective, should include the facts or circumstances of the case at hand so the questioning does not occur in a factual vacuum. "A prospective juror who would invariably vote either for or against the death penalty *because of one or more circumstances likely to be present in the case being tried,* without regard to the strength of aggravating and mitigating circumstances, is . . . subject to challenge for cause." (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248], italics added.) "Consequently, to preserve the right to a fair and impartial jury on the question of penalty, the death qualification process must probe 'prospective jurors' death penalty views *as applied to the general facts of the case* . . . .' " " (*Earp, supra,* 20 Cal.4th at p. 853, italics added.)

We applied these principles to reverse the penalty phase judgment in *Cash.* In that case, the prosecution proposed to introduce evidence at the penalty phase that the defendant, when he was 17 years old, had murdered his elderly grandparents. His defense attorney sought to question prospective jurors to determine whether they "could return a verdict of life without parole for a defendant who had killed more than one person, without revealing that defendant had killed his grandparents." (*Cash, supra,* 28 Cal.4th at p. 719.) This court unanimously found the trial court erred in denying this request. "[T]he trial court's ruling prohibited defendant's trial attorney from inquiring during voir dire whether prospective jurors would automatically vote for the death penalty if the defendant had previously committed another murder. Because in this case defendant's guilt of a prior murder (specifically, the prior murders of his grandparents) was a general fact or circumstance that was

present in the case and *that could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances*, the defense should have been permitted to probe the prospective jurors' attitudes as to that fact or circumstance. In prohibiting voir dire on prior murder, a fact likely to be of great significance to prospective jurors, the trial court erred." (*Id.* at p. 721, italics added.)

Decisions of this court subsequent to *Cash* have indicated the scope of its holding. In *People v. Vieira* (2005) 35 Cal.4th 264, 284 [25 Cal.Rptr.3d 337, 106 P.3d 990], the trial court refused to put the case-specific information that the defendant was charged with multiple murder into the "death qualification" questionnaire directed to exploring the prospective jurors' attitudes about capital punishment in general. We declined to reverse, explaining the court "never suggested that defense counsel could not raise the issue in voir dire. The trial court never ruled that the question was inappropriate." (*Id.* at p. 286.) As we characterized the issue in *Vieira*, counsel simply neglected to follow up on the court's invitation to supply it with supplemental questions during oral voir dire. (See also *Earp, supra*, 20 Cal.4th at p. 855 [insertion of critical information into the jury questionnaire suffices].)

In *Roldan*, we similarly declined to reverse, observing that the defendant failed to explain why the existing information he had about the prospective jurors was "insufficient to exercise his challenges intelligently . . . [or] what additional information he had hoped to discover by having the court ask additional questions." (*Roldan, supra*, 35 Cal.4th at p. 693.) *Cash*, we noted, was distinguishable because there "the defendant sought to ask prospective jurors additional questions on a particularly relevant topic that, on the facts of that case, could have undermined their assertions of impartiality." (*Roldan*, at p. 693.) The revelation in *Cash* that the defendant had previously committed two murders "could potentially have prejudiced even a reasonable juror." (*Roldan*, at p. 694.) In *Roldan*, by contrast, "[t]here were . . . no prior murders, no sensational sex crimes, no child victims, no torture." (*Ibid.*; cf. *Earp, supra*, 20 Cal.4th at p. 853 [trial court's questionnaire informed the jury the charges against defendant "pertained to 'sexual misconduct involving the death of a child' " and asked each juror "whether those charges would have any effect" on the juror's sentencing decision]; *People v. Clark* (1990) 50 Cal.3d 583, 596–597 & fn. 3 [268 Cal.Rptr. 399, 789 P.2d 127] [defendant was not precluded from questioning jurors in the general voir dire about bias arising from the victim's serious burn injuries].)

We most recently confronted the issue in *People v. Zambrano* (2007) 41 Cal.4th 1082 [63 Cal.Rptr.3d 297, 163 P.3d 4]. There the defendant killed and then dismembered his victim, removing his head and hands with an axe or a saw. (*Id.* at p. 1097.) The trial court declined to permit defense counsel to

voir dire the prospective jurors about their ability to remain impartial in choosing between life and death in light of the dismemberment evidence, ruling that inquiry about the " 'method of killing' would, in effect, be asking them to prejudge the case." (*Id.* at p. 1119.) We affirmed. Summarizing the relevant legal principles, we stated: "[A]s we have said on many occasions, '[d]efendant ha[s] no right to ask specific questions that invite[] prospective jurors to prejudge the penalty issue based on a summary of the aggravating and mitigating evidence [citation], to educate the jury as to the facts of the case [citation], or to instruct the jury in matters of law [citation].' [Citations.] [¶] We have explained that '[t]he *Witherspoon-Witt* . . . voir dire seeks to determine only the views of the prospective jurors about capital punishment in the abstract . . . . The inquiry is directed to whether, without knowing the specifics of the case, the juror has an "open mind" on the penalty determination.' [Citation.] . . . [¶] On the other hand, we have indicated that because ' "[a] prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried . . . is . . . subject to challenge for cause," ' the death qualification process 'must probe "prospective jurors' death penalty views as applied to the general facts of the case, whether or not those facts [have] been expressly charged." '[3] [Citation.] [¶] Reconciling these competing principles dictates that 'death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. [Citation.] In deciding where to strike the balance in a particular case, trial courts have considerable discretion. [Citations.]' " (*People v. Zambrano, supra,* 41 Cal.4th at pp. 1120–1121.)

We concluded the trial court in *Zambrano* did not abuse its discretion. "The sole fact as to which the defense unsuccessfully sought additional inquiry—the condition of the adult murder victim's body when found—was not one that could cause a reasonable juror—i.e., one whose death penalty attitudes otherwise qualified him or her to sit on a capital jury—invariably to vote for death, regardless of the strength of the mitigating evidence. No child victim, prior murder, or sexual implications were involved. Nor, to the extent juror emotions might thereby be aroused, would there be evidence that [the victim] was dismembered while alive." (*People v. Zambrano, supra,* 41 Cal.4th at p. 1122, italics omitted; but see *id.* at p. 1201 (conc. & dis. opn. of

---

[3] That in appropriate cases the jury must be informed of relevant facts of the case beyond those charged in the information is well established. (*Earp, supra,* 20 Cal.4th at p. 853; *People v. Kirkpatrick, supra,* 7 Cal.4th at p. 1005; see also *Cash, supra,* 28 Cal.4th at p. 719 [prior murder not alleged in the charging documents].)

Kennard, J.) ["the murder victim's dismemberment by defendant was 'a general fact or circumstance' likely to elicit a strong emotional response from the jurors" and "may be of great significance to a prospective juror"].)

In sum, in order to ensure the state fulfills its constitutional mandate to provide a capital defendant with a fair and impartial jury, questioning on voir dire should include mention of case-specific facts and circumstances if they are such as could convert an otherwise fair and reasonable juror into one who would invariably vote for the death penalty regardless of the mitigating circumstances.

## II

The majority avoids addressing the difficult issue of whether the trial court erred by refusing to question prospective jurors with particular facts of the case by concluding defendant procedurally forfeited the issue. The record shows otherwise. To preserve this issue for appellate review, a criminal defendant need only have objected to the questionnaire "or to the manner or completeness of the [trial] court's questioning on this issue." (*Roldan, supra,* 35 Cal.4th at p. 694.) By doing so, a defendant alerts the trial court to a possible error and provides the opportunity for correction. (*People v. Saunders* (1993) 5 Cal.4th 580, 590 [20 Cal.Rptr.2d 638, 853 P.2d 1093] [addressing Pen. Code, § 1025].) This defendant clearly did.

From the beginning, defense counsel for both defendant and codefendant Donna Lee were unhappy with the completeness of the trial court's voir dire questioning. Both in various terms urged the trial court to inform prospective jurors the case involved willful, premeditated murder with special circumstances, and two murders, not just one, as well as other particulars. At one point, counsel for codefendant Lee argued this court's precedents authorized a more factually detailed voir dire inquiry to determine "whether the potential juror has a fair and open mind . . . *under the circumstances of the case.*" (Italics added.) The trial court disagreed, responding the voir dire process is intended to determine whether a juror will vote for the death penalty in "any case," not just this particular case. The court later clarified it intended to determine whether any of the prospective jurors would automatically vote for death if one or more of the special circumstances were proven true.

Later in the voir dire, counsel for codefendant raised the point again, stating: "The point that I was trying to make is that when we started doing the four-question initial screening, the court indicated at that time when I objected that *it would be more case specific* about people who would automatically give death in a case *involving two who are—*" (Italics added.) The court cut counsel off, saying: "No, no, I didn't, sir. If I [said that], I

misspoke myself. The case law is quite clear that *you do not get to this specific case*." (Italics added.) That the trial court understood counsel's objection embraced a claim that jurors should be informed during voir dire that the two victims were related to the accused is clear. But if any question remained, it was soon dispelled. When considering the responses of Prospective Juror A.L., codefendant's counsel stated: "Your Honor, . . . throughout this trial, with probably ten jurors who have expressed very strong support for the death penalty, *we have repeatedly asked to talk about case specific kind[s] of considerations and you have steadfastly refused to do so.*" Codefendant's counsel continued: "We don't even know whether [Prospective Juror A.L.] could consider a death penalty *under the circumstances of this case* as alleged by the prosecution, that two brutal murders, *familial*, for financial gain." (Italics added.) Counsel for defendant expressly joined codefendant's objection.

The trial court responded: "I have found no case that says, yes, you should ask a juror can you impose a death sentence where it's two murders for cause—for financial gain with ambush *where the defendant is the son of one of the victims, where he's the ex-boyfriend of the other one*, et cetera. So there you and I part company." (Italics added.) Later, justifying its denial, the court stated: "But the law doesn't say that if your view is that *somebody who kills their mother for financial gain and under ambush*, and your feelings are under those circumstances, the death penalty is appropriate, that you are challengeable for cause." (Italics added.) Clearly, the trial court understood that both defense counsel were seeking to have the prospective jurors informed of, and questioned about, the fact defendant allegedly killed his mother and the mother of his son in an ambush.

Contrary to the majority's conclusion, therefore, defendant adequately apprised the trial court of both the existence and the nature of his objection to the "manner or completeness of the [trial] court's questioning on this issue" (*Roldan, supra*, 35 Cal.4th at p. 694), permitting the trial court to correct the error. But even accepting the majority's reasoning that defense counsel's failure to mention the word "matricide" in his written motion or his complaints following the court's initial denial of his objection could theoretically constitute a forfeiture (maj. opn., *ante*, p. 1288, fn. 14), any failure to object with more specificity was excusable in the circumstances. The requirement of a timely objection "is only the general rule. A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673] [referring to prosecutorial misconduct].) Here, given that the trial court repeatedly and pointedly refused to mention even the lying-in-wait, financial-gain and multiple-murder special circumstances when questioning individual prospective jurors, defense counsel may reasonably have believed that requesting the court to also mention

the matricidal and intrafamilial aspects of the case would have been futile. Such futility excuses any failure on counsel's part to register a more specific objection.[4]

Having found the issue properly preserved for this court's review, I turn to the merits.

## III

The trial court refused to ask prospective jurors whether they could remain impartial in a case in which a defendant lured his own mother, as well as the mother of his child, to their deaths in a premeditated Mother's Day ambush. That decision was contrary to our precedents. (*People v. Zambrano, supra,* 41 Cal.4th at pp. 1120–1121; *Roldan, supra,* 35 Cal.4th at p. 694; *People v. Vieira, supra,* 35 Cal.4th at pp. 284–286; *Cash, supra,* 28 Cal.4th at p. 723; *Earp, supra,* 20 Cal.4th at p. 853; *People v. Kirkpatrick, supra,* 7 Cal.4th at p. 1005.) As we explained in *Cash,* the real question to be answered during voir dire is "whether the juror's views about capital punishment would prevent or impair the juror's ability *to return a verdict of life without parole in the case before the juror.*" (*Cash,* at p. 720, italics added.) If an otherwise fair prospective juror—that is, someone with the professed ability to follow the law and vote for either the death penalty or life imprisonment depending on the circumstances—would be so affected upon learning certain facts that the juror could no longer vote for life imprisonment regardless of the strength of the mitigating evidence, then that prospective juror should be excluded.

Not every fact is of a type that would be likely to undermine a juror's ability to remain impartial. Our opinions give some content to the question. For example, this court has found that many prospective jurors might no longer be able to consider a life term an adequate or proportionate punishment for a murderer who has previously taken someone's life (*Cash, supra,* 28 Cal.4th at p. 721), who killed more than one person in the present crime (*People v. Vieira, supra,* 35 Cal.4th at p. 286), or who committed sexual acts on a child (*Earp, supra,* 20 Cal.4th at p. 855). Similarly, we have suggested that "sensational sex crimes," crimes against children or those involving torture might also be the sort of facts that should be revealed to prospective jurors on voir dire. (*Roldan, supra,* 35 Cal.4th at p. 694.) By contrast,

---

[4] Moreover, by relying on the forfeiture doctrine, the majority overlooks that although a party may forfeit the right to raise a claim of error on appeal by failing to object, that circumstance "does not compel the conclusion that, by operation of his default, the appellate court is deprived of authority [to address the issue]. *An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party.*" (*People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6 [69 Cal.Rptr.2d 917, 948 P.2d 429], italics added.) As I conclude defendant adequately raised the issue below and that any failure to do so was in any event excused, however, I express no opinion whether it would be appropriate to reach the issue in the complete absence of an objection.

dismemberment of the victim, at least in the absence of evidence the victim was alive when it occurred, does not qualify. (*People v. Zambrano, supra*, 41 Cal.4th at pp. 1118–1123; but see *id.* at p. 1201 (conc. & dis. opn. of Kennard, J.).)

Taken together, these cases paint a coherent picture, delineating the types of extreme situations in which an otherwise impartial and reasonable juror might find he or she is no longer able to consider a life sentence for a particular offender. In such cases, inquiry using the critical facts or circumstances of the case—either directly from the trial court or the attorneys (*People v. Vieira, supra*, 35 Cal.4th at p. 286) or in the jury questionnaire (*Earp, supra*, 20 Cal.4th at p. 855)—is necessary to ensure that the regular and alternate jurors ultimately selected will be impartial and able to faithfully follow the law.[5]

In the instant case, defendant was accused of luring his own mother, Doris Carasi, as well as the mother of his child, Sonia Salinas—on Mother's Day—to an isolated part of a shopping mall parking lot, at which time in the presence of his infant son he completed his premeditated plan to brutally stab them to death with the assistance of his new girlfriend, Donna Lee. He was thus charged with committing "the most horrible crime of matricide." (*People v. Weber* (1906) 149 Cal. 325, 349 [86 P. 671].) Although our society's constant exposure to media reports of violence may cause some to become jaded, rare is the day one learns an accused has killed his own mother. Matricide provokes strong, visceral emotions, a fact used many times in ancient and classic stories,[6] books, and movies[7] to heighten dramatic tension

---

[5] The principle applies to both sides: The prosecutor is entitled to question prospective jurors on a variety of topics during voir dire to ensure those ultimately chosen are impartial and can faithfully follow the law. "A prosecutor may properly inquire whether a prospective juror could impose the death penalty on a defendant in a felony-murder case (*People v. Pinholster* (1992) 1 Cal.4th 865, 916–917 [4 Cal.Rptr.2d 765, 824 P.2d 571]), on a defendant who did not personally kill the victim (*People v. Ochoa* [(2001)] 26 Cal.4th [398,] 431 [110 Cal.Rptr.2d 324, 28 P.3d 78] . . .), on a young defendant or one who lacked a prior murder conviction (*People v. Livaditis*[, *supra*,] 2 Cal.4th [at pp.] 772–773 [9 Cal.Rptr.2d 72, 831 P.2d 297]), or only in particularly extreme cases unlike the case being tried (*People v. Bradford* [(1997)] 15 Cal.4th [1229,] 1320 [65 Cal.Rptr.2d 145, 939 P.2d 259])." (*Cash, supra*, 28 Cal.4th at p. 721, citation omitted.)

[6] In ancient Greek mythology, Orestes and Electra murder their mother, Clytemnestra, as revenge for her part in the death of their father, Agamemnon. Roman Emperor Nero is infamous for ordering the death of his mother, Agrippina the Younger, in 59 A.D. Shakespeare refers to this latter fact in Hamlet, act III, scene 2, where the Prince of Denmark, angry with his mother, goes to her but cautions himself to speak harsh words to her only and not to commit physical violence against her ("I will speak daggers to her, but use none"), saying, "let not ever the soul of Nero enter this firm bosom," noting that the crime of matricide is "unnatural."

[7] E.g., Savage Grace (IFC Films 2007), Heavenly Creatures (Miramax Films 1994), Carrie (United Artists 1976), Psycho (Paramount 1960).

and instill a sense of revulsion in the reader or viewer. That defendant could murder the one who brought him into the world could well have convinced an otherwise fair and reasonable prospective juror that the perpetrator of such an abominable act would not respond to the rehabilitative power of the state and would be impervious to the redemptive power of any religious or spiritual intervention: that he was, in short, beyond hope.

That defendant killed not just his own mother but Sonia Salinas, the mother of his child, further aggravates the situation. That he and Salinas together brought another life into the world, and that by his hand defendant deprived his son of not only his grandmother but his own mother as well, could very likely have confirmed for a reasonable prospective juror that a life sentence for defendant could never be justified.

The trial court thus erred by refusing to question the prospective jurors concerning these facts. As was the case in *Cash*, "[b]ecause the trial court's error makes it impossible for us to determine from the record whether any of the individuals who were ultimately seated as jurors held the disqualifying view that the death penalty should be imposed invariably and automatically on any defendant who had [killed his mother and the mother of his child], it cannot be dismissed as harmless." (*Cash, supra,* 28 Cal.4th at p. 723.) As in *Cash*, defendant's judgment of death should be reversed.

## IV

This court has issued no shortage of decisions involving the procedures applicable to the questioning and excusing of prospective jurors in capital cases. Although all would agree with the general rule that those accused of capital crimes are entitled to a fair and impartial jury, the devil is often in the details of how that jury is ultimately chosen—which prospective jurors are retained and which are properly excused. As we map the outer boundaries of the constitutional requirements applicable to jury selection, our best efforts to ensure fairness sometimes fall short of the mark.[8] In this case, awareness of the unusual and disturbing facts of the case reasonably could have convinced

---

[8] See, e.g., *People v. Johnson* (2003) 30 Cal.4th 1302, 1306 [1 Cal.Rptr.3d 1, 71 P.3d 270] (*Johnson I*) (moving party had burden to "show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias"), overruled in *Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410]; *Johnson I*, at pp. 1324–1325 (appellate courts need not undertake a comparative juror analysis for the first time on appeal in a third-stage *Batson* case), overruled in *Snyder v. Louisiana* (2008) 552 U.S. 472 [170 L.Ed.2d 175, 128 S.Ct. 1203], as explained in *People v. Lenix* (2008) 44 Cal.4th 602, 611–612, 630 [80 Cal.Rptr.3d 98, 187 P.3d 946]; *People v. Johnson* (2006) 38 Cal.4th 1096 [45 Cal.Rptr.3d 1, 136 P.3d 804] (remand a permissible remedy for *Batson* error), called into question in *Snyder v. Louisiana*, 552 U.S. at p. ___ [128 S.Ct. at p. 1212] (refusing to order

an otherwise fair and impartial juror that he or she would be unable to vote for a life sentence regardless of the strength of the mitigating evidence. Accordingly, the trial court erred by refusing to conduct the case-specific inquiry defendant sought. Because the majority holds otherwise, I dissent from the affirmance of the penalty judgment.

Kennard, J., concurred.

Appellant's petition for a rehearing was denied October 16, 2008.

---

remand because there was no "realistic possibility" the "subtle question of causation could be profitably explored further on remand at this late date, more than a decade after petitioner's trial").